**HOME FEDERAL BANK OF TENNESSEE, F.S.B.
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–541C.

United States Court of Federal Claims.

Aug. 26, 2003.

Thomas M. Buchanan, Washington, DC, for the plaintiff. Eric W. Bloom, Charles B. Klien, and Lewis C. Foster, of counsel.

Luke Levasseur, Washington, DC, with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for the defendant. Maureen A. Delaney, Department of Justice, of counsel.

## OPINION

YOCK, Senior Judge.

On August 8, 1995, Home Federal Bank of Tennessee, F.S.B. ("Home Federal" or the "Plaintiff") filed a Complaint with this Court against the United States (the "Defendant" or the "Government") alleging breach of contract, breach of contract implied in fact, and uncompensated Fifth Amendment takings. The Plaintiff subsequently withdrew its Fifth Amendment takings claim, and judgment was entered striking this claim from the Complaint. This matter is now before the Court on the Plaintiff's Motion for Partial Summary Judgment (as to liability) and the Defendant's Cross–Motion for Summary Judgment (as to liability). For the reasons set forth herein, the Plaintiff's Motion for Partial Summary Judgment is denied, and the Defendant's Cross–Motion for Summary Judgment is granted in part and denied in part.

*Background*

I. Regulatory History

This case is one of the numerous *Winstar*-related cases currently pending before this Court. These cases arose in the aftermath of the Government's efforts to contain the savings and loan crisis of the late 1970's and the early 1980's. The details of this financial crisis have been fully articulated in *United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*"Winstar III"*), and other opinions of this Court. *See, e.g., Bluebonnet Sav. Bank, F.S.B. v. United States,* 47 Fed.Cl. 156, 158 (2000), *rev'd on other grounds,* 266 F.3d 1348, 1354–55 (Fed. Cir.2001).

As the Supreme Court observed in *Winstar III,* the thrift industry was and is a highly regulated enterprise. 518 U.S. at 844, 116 S.Ct. 2432 (citing *Fahey v. Mallonee,* 332 U.S. 245, 250, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947)). Prior to the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), the industry was overseen primarily by two federal agencies: the Federal Home Loan Bank Board (the "FHLBB" or the "Bank Board"), which chartered and regulated thrifts, and the Federal Savings and Loan Insurance Corporation (the "FSLIC" or the "Corporation"), which insured the deposits held by thrifts. *Id. See* Federal Home Loan Bank Act, ch. 522, 47 Stat. 725 (1932) (codified, as amended, at 12 U.S.C. §§ 1421–1449 (1988 ed.)); Home Owners' Loan Act, ch. 64, 48 Stat. 128 (1933) (codified, as amended, at 12 U.S.C. §§ 1461–1468 (1988 ed.)); National Housing Act, ch. 847, 48 Stat. 1246 (1934) (codified, as amended, at 12 U.S.C. §§ 1701–1750g (1988 ed.)). In its capacity as a regulatory agency, the FHLBB required insured institutions to maintain specified levels of net

worth and oversaw the merger or acquisition of one insured institution with another. *See, e.g.,* 12 C.F.R. §§ 563.13(b)(2), 571.5 (1982). For its part, the FSLIC was charged with administering the insurance fund and assessing premiums upon the thrift industry to sustain this fund. *See* 12 U.S.C. §§ 1726, 1727(b) (1988 ed.) (repealed). This Depression-era regulatory regime worked well for many years.

During the late 1970's and the early 1980's, however, the thrift industry faced a new financial crisis that threatened to deplete the Corporation's insurance fund. *See Winstar III,* 518 U.S. at 846–47, 116 S.Ct. 2432. Short-term interest rates paid to depositors by savings and loan associations rose to a level that exceeded the fixed, long-term interest rates received by such institutions from home mortgage loans, creating a significant threat to the solvency of many thrifts. *See id.* "By the end of 1982, 415 [savings and loan institutions] with $220 billion of assets were insolvent based on the book value of their tangible net worth. This constituted 13 percent of all [savings and loans] and these institutions held 32 percent of industry assets." · Nat'l Comm'n on Fin. Inst. Reform, Recovery & Enforcement, *Origins and Causes of the S & L Debacle: A Blueprint for Reform* 31 (1993).

In an effort to save failing thrifts while containing the costs to the FSLIC insurance fund, the FHLBB began to encourage healthy thrifts to take over weak thrifts through "supervisory mergers." *Winstar III,* 518 U.S. at 847–48, 116 S.Ct. 2432. The FSLIC and the FHLBB assisted and promoted these mergers through various means, including the use of noncash incentives such as the specialized accounting treatment of "supervisory goodwill." The special treatment of "supervisory goodwill" allowed a thrift to inflate regulatory capital by using the purchase method of accounting to treat the goodwill recognized as a result of the acquisition as regulatory capital. Such goodwill was calculated as the equivalent of the excess of the fair market value of the liabilities assumed over the fair market value of the assets acquired. Without such a forbearance, the Bank Board would have treated any such goodwill as an intangible asset, which would not have been added to the bank's regulatory capital. By increasing the thrift's regulatory capital through such non-cash incentives, the thrift was permitted to keep less cash on hand and make more loans, thereby increasing potential profitability. *Id.* at 850–51, 116 S.Ct. 2432. Such a forbearance had the dual benefit of encouraging a healthy thrift to take over a failing one, while requiring no cash outlay on the part of the FSLIC.

## II. Home Federal's Acquisitions

The Plaintiff, Home Federal, is a federally-chartered mutual savings and loan that is headquartered in Knoxville, Tennessee. Home Federal operates today in and around the Knoxville region. During the early 1980's, Home Federal acquired three financially-troubled savings and loans in separate transactions. The Plaintiff asserts in its Complaint that each of these transactions involved a *Winstar*-type contractual promise by the Government to allow the specialized accounting treatment of supervisory goodwill and that these promises were breached by subsequent legislation.

### I. First Federal and Security Federal Transactions

First Federal Savings and Loan Association ("First Federal") and Security Federal Savings and Loan Association ("Security Federal") were federally-insured savings and loan institutions. Both First Federal and Security Federal were located in counties near Home Federal's central base of operations: First Federal was operated out of Sevierville, Tennessee, while Security Federal was based in Alcoa, Tennessee.

Home Federal claims that the supervisory agents of the Federal Home Loan Bank–Cincinnati ("FHLB–Cincinnati") specifically sought out Home Federal as a merger partner for First Federal and Security Federal. The Plaintiff also asserts that such a merger was the only feasible solution to the two institutions' serious financial difficulties. The Government, however, claims that none of the parties can recall who began the merger discussions and asserts that First Federal

and Security Federal were not in the dire straits that the Plaintiff contends.

In any event, the Plaintiff and First Federal entered into negotiations between and among themselves and with the FHLB–Cincinnati to arrange for the Plaintiff to acquire the thrift. On March 28, 1981, Home Federal executed a merger agreement with First Federal. (App. to Pl.'s Mot. for Partial Summ. J. ("Pl.'s Mot. for Summ. J.App."), Ex. Al.) On April 10, 1981, Home Federal submitted an application for approval of the merger to the FHLBB. In the event of FHLBB approval, the application materials provided that Home Federal would record the merger with First Federal using the "pooling of interests" method of accounting. (Def.'s Supplemental Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. and in Supp. of Def.'s Mot. to Dismiss and Cross–Mot. for Partial Summ. J.App. ("Def.'s Supplemental Mem.App.") 116.) The merger was to be effective as of August 31, 1981. (Pl.'s Mot. for Summ. J.App., Ex. A3.)

The Plaintiff, Security Federal, and the FHLB–Cincinnati also entered into negotiations between and among themselves to arrange for the Plaintiff to acquire Security Federal. On May 30, 1981, Home Federal executed a merger agreement with Security Federal. On June 19, 1981, Home Federal submitted an application for approval of this merger to the FHLBB. Similar to the First Federal merger application, the materials appended to the Security Federal merger application provided that Home would record the merger under the "pooling of interests" method of accounting. (Def.'s Supplemental Mem.App. 117.) This merger also was to be effective as of August 31, 1981. (Pl.'s Mot. for Summ. J.App., Ex. A4.)

On July 30, 1981, the Bank Board issued Resolution V–T–M–81–6, approving the merger of Home Federal and Security Federal. (Pl.'s Mot. for Summ. J.App., Ex. A6.) On August 6, 1981, the FHLBB issued Resolution 81–441, conditionally approving Home Federal's merger with First Federal. (*Id.*, Ex. A7.) The FHLBB also issued a forbearance letter on August 6, 1981, regarding the First Federal merger. The forbearance letter referenced the exclusion of scheduled

items attributable to First Federal in calculating Home Federal's net worth but did not mention applying any goodwill from the merger toward regulatory capital. (Def.'s Supplemental Mem.App. 118–119.) Indeed, none of the documents issued by the Bank Board mentioned the use of a particular method of accounting for recording the merger or discussed counting any potential goodwill resulting from the mergers toward regulatory capital.

On August 7, 1981, Mr. David Sharp("Mr. Sharp"), president of Home Federal, sent a letter to Mr. Lawrence Muldoon ("Mr. Muldoon"), a Supervisory Agent for the FHLB–Cincinnati, regarding the possible treatment of Home Federal's merger applications with First Federal and Security Federal in accordance with the purchase method of accounting, rather than the pooling of interests method. The letter provided:

On Wednesday morning, August 5, I talked with David Bradley, Supervisory Agent–Industry Development, about the possibility of conditioning our Merger Applications with First Federal of Sevierville and Security Federal of Alcoa on a "purchase of assets" basis rather than a "pooling of interests". For profitability reasons, this proposed accounting concept would allow us to write down to market value the assets of these two associations and permit us to take the discount into income over the next ten years. The reevaluation of assets would cause each disappearing institution to have a negative net worth which the resulting institution could establish on its books as other intangible assets that would be amortized over a forty year period. This accounting procedure, if approved by the Federal Home Loan Bank Board, could be extremely beneficial to the resulting institution by improving its profitability significantly.

In these uncertain times, approval of our request is needed and can be justified by the fact that no one is really interested today in assuming the assets and liabilities of an existing association except for the market potential. We consider the market a long-term asset which will benefit the association indefinitely. * * * I was ad-

vised to make our request in writing and wait for a timely ruling from the Federal Home Loan Bank Board before finalizing the Merger Agreements with First Federal of Sevierville and Security Federal of Alcoa.

We apologize for not giving this purchase method adequate consideration at the time of filing our Merger Applications; however, due to the economic condition of our industry, which has worsened considerably since the filing of our applications, I do not consider it advisable to consummate these mergers until we have received an answer to this request.

(Pl.'s Mot. for Summ. J.App., Ex. A5 (Letter from David Sharp, president, Home Federal, to Lawrence Muldoon, Supervisory Agent, FHLB–Cincinnati, Aug. 7, 1981)). Attached to this letter was correspondence from Home Federal's Treasurer and an outside auditor justifying Home Federal's potential use of the purchase method of accounting. (*Id.*) The Plaintiff alleges that this letter "explicitly made the consummation" of the First Federal and Security Federal mergers "contingent upon the FHLBB permitting Home Federal to treat the mergers in accordance with the purchase method of accounting * * *." (Pl.'s Resp. to Def.'s Supplemental Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. and in Supp. of Def.'s Mot. to Dismiss and Cross–Mot. for Partial Summ. J. 8, 10.)

In response to this letter, Mr. Muldoon wrote back, on August 25, 1981, stating:

This is in response to your letter of August 7, 1981, requesting approval to account for the subject mergers pursuant to the purchase method of accounting rather than the pooling of interests. * * *
* * * *

We have no objection to your request to account for the mergers of First FS & LA of Sevierville and Security FS & LA of Alcoa by the purchase method of accounting, provided you can substantiate such accounting treatment.

(Pl.'s Mot. for Summ. J.App., Ex. A8 (Letter from Lawrence Muldoon, Supervisory Agent, FHLB–Cincinnati to David Sharp, president, Home Federal, Aug. 25, 1981)). The Plaintiff

characterizes the letter from Mr. Muldoon as an "acceptance" of Home Federal's purported offer that it be allowed to use the purchase method of accounting with regard to the two transactions.

The First Federal and Security Federal mergers became effective on August 31, 1981, without further incident. Home Federal proceeded to treat the negative net worth of First Federal and Security Federal as an asset, with no objection from the FHLBB or the FSLIC.

## II. Second Federal

Second Federal Savings and Loan Association ("Second Federal") was a federally-insured savings and loan institution located in Oak Ridge, Tennessee. The Plaintiff contends that, following the First Federal and Security Federal transactions, he was contacted by agents of the FHLBB regarding the possibility of merging with Second Federal. After negotiating with Second Federal, on November 19, 1981, Home Federal executed a merger agreement with the thrift. The merger was to be effective as of December 31, 1981. (Pl.'s Mot. for Summ. J.App., Ex. A15.)

On November 20, 1981, Home Federal submitted an application to the FHLBB seeking approval of its merger with Second Federal. While the application contained no explicit request regarding the inclusion of goodwill, the transmittal letter asked for "all appropriate relief relative to scheduled items and net worth requirements in view of the financial condition of Second Federal of Oak Ridge." (Def.'s Supplemental Mem.App. 214.) Moreover, the application was accompanied by two letters from Home Federal's vice president and treasurer, Mr. Ray Thomas, to the FHLB–Cincinnati stating, respectively, that "[t]he merger will be accounted for using the purchase method which is in accordance with generally accepted accounting principles" and "Home will account for the merger using the purchase method." *Id.* at 225, 227.

On December 24, 1981, the Bank Board issued Resolution V–T–M–81–16, approving the merger of Home Federal and Second

Federal. This Resolution specifically provided:

> That if Home [Federal] desires to use the purchase method of accounting for the merger, Home shall furnish an opinion from an independent accountant satisfactory to the Supervisory Agent which (a) indicates the justification under generally accepted accounting principles for the use of the purchase method of accounting for the merger, (b) specifically describe, as of the the [sic] effective date of the merger, any goodwill or discount of assets arising from the merger to be recorded on Home's books, and (c) substantiate the reasonableness of amounts attributed to goodwill and the discount of assets and the resulting amortization periods and methods.

(Pl.'s Mot. for Summ. J.App., Ex. A11 at 2.)

In accordance with the FHLBB Resolution, on January 29, 1982, Home Federal's independent accountant sent a letter to Mr. Muldoon justifying and describing the use of the purchase method of accounting for the merger with Second Federal. (Pl.'s Mot. for Summ. J.App., Ex. A12 (Letter from Charles White, CPA, Pugh & Co. to Lawrence Muldoon, Supervisory Agent, FHLB-Cincinnati, Jan. 29, 1982)). Home Federal proceeded to treat the negative net worth of Second Federal as an asset, with no objection from the FHLBB or the FSLIC.

**(3) The Financial Institutions Reform, Recovery and Enforcement Act**

Approximately seven years later, on August 9, 1989, Congress drastically altered the regulatory environs to effectively forbid the use of certain regulatory forbearances with the enactment of FIRREA. Pub.L. No. 101–73, 103 Stat. 183 (1989). *See generally, Winstar III*, 518 U.S. at 856–58, 116 S.Ct. 2432. Specifically, FIRREA established three new capital standards: (1) "tangible" capital, which was to be maintained "in an amount not less than 1.5 percent of the savings association's total assets;" (2) "core" capital, which was to be maintained "in an amount not less than 3 percent of the savings association's total assets;" and (3) "risk-based" capital, which was to be maintained at a level that was not to be "materially lower"

than that required of national banks. 12 U.S.C. § 1464(t) (1994). Under FIRREA, unidentifiable intangible assets (such as supervisory goodwill) could not be counted towards "tangible" capital, were to be phased out of calculations for "core" capital by 1995, and had to be amortized over 20 years for the purposes of calculating "risk-based" capital. *Id.* § 1464(t)(3)(A), (t)(9)(A)–(C). The Act also abolished the FSLIC and created a new insurance fund to be managed by the Federal Deposit Insurance Corporation (the "FDIC"). Finally, the Act replaced the Bank Board with the Office of Thrift Supervision (the "OTS"), and established the Resolution Trust Corporation to liquidate or otherwise dispose of certain closed thrifts and their assets. *Id.* §§ 1441a, 1821.

FIRREA required the OTS to "prescribe and maintain uniformly applicable capital standards for savings associations" in accordance with the requirements of the statute. 12 U.S.C. § 1464(t)(1)(A). To this end, the OTS was to promulgate new final regulations implementing FIRREA within 90 days of enactment of the statute, to take effect within 120 days of enactment. *Id.* § 1464(t)(1)(D). The OTS issued these interim final regulations on November 8, 1989, and the regulations were scheduled to go into effect on December 7, 1989. Regulatory Capital, 54 Fed.Reg. 46,845 (Nov. 8, 1989).

On January 9, 1990, the OTS issued Thrift Bulletin No. 38–2, advising the thrift industry that FIRREA "eliminates forbearances" previously granted to certain thrifts and advising "[a]ll savings associations presently operating with these [capital and accounting] forbearances * * * should eliminate them in determining whether or not they comply with the new minimum regulatory capital standards." Office of Thrift Supervision, *Capital Adequacy: Guidance on the Status of Capital and Accounting Forbearances and Capital Instruments Held by a Deposit Insurance Fund,* Thrift Bulletin No. 38–2, 1990 WL 309397 at *1 (Jan. 9, 1990).

According to the Plaintiff, FIRREA and the new capital standards regulations eliminated $20.477 million in regulatory capital from Home Federal's books. While Home Federal lost the ability to count its unamor-

tized supervisory goodwill toward its regulatory capital, the Plaintiff remained able to meet and exceed all regulatory capital requirements under FIRREA and the corresponding OTS regulations. Nevertheless, the Plaintiff contends that FIRREA significantly curtailed Home Federal's ability to grow and to increase its earnings. The Plaintiff also asserts that the elimination of supervisory goodwill adversely affected Home Federal's day-to-day operations, thereby reducing its earnings and profits. (Compl. ¶ 15.)

### (4) Procedural History

On August 8, 1995, Home Federal filed a Complaint with this Court against the Defendant alleging breach of contract, breach of contract implied in fact,[1] and uncompensated Fifth Amendment takings. The Complaint asserted that FIRREA had abrogated a purported agreement between Home Federal and the Government to treat the negative net worth of three acquired institutions as an asset, thereby causing significant damages to Home Federal. These allegations marked this matter as one of the numerous *Winstar*-related cases then pending before this Court.

On July 1, 1996, the United States Supreme Court issued its opinion in *Winstar III*, upholding the trial court's determination that FIRREA had breached the Government's contracts to provide the *Winstar* plaintiffs with special accounting allowances. *See Winstar Corp. v. United States*, 21 Cl.Ct. 112 (1990) (finding an implied-in-fact contract), *clarified*, 25 Cl.Ct. 147 (1992), *supplemented*, 25 Cl.Ct. 541 (1992) (finding breach of contract and entering summary judgment on liability), *Statesman Sav. Holding Corp. v. United States*, 26 Cl.Ct. 904 (1992) (entering summary judgment on liability), *rev'd and remanded*, 994 F.2d 797 (Fed.Cir.1993), *reh'g en banc granted and judgment vacated*, 994 F.2d 797 (Fed.Cir.1993), *reh'g en banc*, 64 F.3d 1531 (*"Winstar II"*), *cert. granted*, 516 U.S. 1087, 116 S.Ct. 806, 133 L.Ed.2d 753 (1996), *aff'd and remanded*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

On July 23, 1996, the Defendant filed a motion with then-Chief Judge Smith encouraging this Court to adopt special case management procedures for all the *Winstar*-related cases.[2] In response to Defendant's motion, on August 28, 1996, this case was reassigned to then-Chief Judge Smith, who came to oversee temporarily all of this Court's *Winstar*-related litigation. Further, the Court issued an Omnibus Case Management Order on September 18, 1996. The Order set forth optional procedures that permitted the plaintiffs in the *Winstar*-related cases to each file a "short-form" motion for partial summary judgment on liability for breach of contract.[3]

Pursuant to the Court's September 18, 1996 Order, the Plaintiff filed a motion for partial summary judgment (as to liability) on July 14, 1997.[4] The Defendant responded to

---

1. The Plaintiff mislabeled this count in its original Complaint as breach of contract "implied in law." Nevertheless, it is clear from the elements of the claim articulated in the original Complaint and the Plaintiff's subsequent representations that this claim is actually one for a breach of contract implied in fact.

2. A copy of this Motion also was filed directly in this case on July 24, 1996, to ensure that the Plaintiff had adequate notice of the Defendant's motion.

3. The plaintiffs were permitted to file a motion for summary judgment regarding two issues under this Order: whether there was a *Winstar*-type contract and whether FIRREA was inconsistent with that contract. The Defendant was given an extended time period to respond via a two-step procedure: within 60 days, the Defendant was required to file a response to the formation and breach issues; and within 120 days, the Defen-

dant was required to raise any defenses. Further, the Defendant was not required to file an Answer, and the parties were relieved of their obligation to file proposed findings of fact and statements of genuine issues.

4. There is some confusion as to the date of this filing. On September 10, 1997, this Court stated in an Order that it had not received the Plaintiff's Motion for Partial Summary Judgment and Ordered the Plaintiff to refile the document. On September 18, 1997, the Plaintiff dutifully refiled its Motion for Partial Summary Judgment, asserting that the original had been filed with this Court on June 27, 1997. Subsequent review of the case file, however, reveals that the Plaintiff's Motion for Partial Summary Judgment was filed with the Clerk's office, by leave of the Judge, on July 14, 1997. Therefore, this Court will use July 14, 1997, as the date of this filing for the present purposes.

the Plaintiff's motion on September 18, 1997,[5] and cross-moved for summary judgment. The Defendant also filed its 120–day Response in accordance with the September 18, 1996 Order, stating that the Defendant was not aware of any additional defenses to the Plaintiff's motion. The Plaintiff replied in support of its motion and in opposition to the cross-motion on November 24, 1997, and the Defendant replied in support of its cross-motion on January 7, 1998.

In the meantime, then-Chief Judge Smith had begun to hold consolidated hearings on several "common issues" for four *Winstar*-related cases. On December 22, 1997, this Court issued its decision in *California Federal Bank, F.S.B. v. United States*, 39 Fed.Cl. 753 (1997) (*"California Federal I"*), resolving all these common issues in favor of the plaintiffs in the four cases.[6] The Court contemporaneously issued an Order to Show Cause for the other *Winstar*-related cases.

On February 20, 1998, the Government responded to the Court's Order to Show Cause, objecting to the legitimacy of the common issues proceeding in *California Federal I*. On March 11, 1998, this Court directed all plaintiffs in the *Winstar*-related cases with a pending summary judgment motion to submit a proposed order granting partial summary judgment as to liability. The Plaintiffs filed a Proposed Order Granting Partial Summary Judgment on Liability on April 21, 1998. The Government responded to the Plaintiffs' Proposed Order on April 30, 1998, and the Plaintiffs filed their reply on May 15, 1998. The Defendant filed a final reply regarding the Proposed Order on May 28, 1998.

The Defendant further filed a Supplemental Cross–Motion to Dismiss and for Partial Summary Judgment on October 10, 2000, along with Proposed Findings of Uncontroverted Facts. The Supplemental Motion was opposed by the Plaintiff, who responded on January 12, 2001, enclosing a Statement of Genuine Issues and its own Proposed Findings of Uncontroverted Facts. The Defendant responded to the Plaintiff's Opposition and Proposed Findings of Uncontroverted Facts on February 27, 2001.

On February 1, 2002, this case was reassigned to the present judge. At a February 28, 2002 status conference before this Court, the Plaintiff moved to amend its Complaint to withdraw its uncompensated Fifth Amendment takings claim. Thus, this Court ordered the Clerk to enter final judgment dismissing the Plaintiff's takings claim. The Court also ordered the parties to supplement their motions to reflect any clarifications in the law that had occurred since their last filings. In accordance with this Order, the Plaintiff filed a supplemental memorandum on March 11, 2002, and the Defendant responded on March 22, 2002.

Finally, on August 29, 2002, this Court ordered the parties to file a motion for oral argument, if they so desired, by September 20, 2002. Neither party requested oral argument in response to this Order, and oral argument is deemed unnecessary. This case is ready for disposition with regards to liability.

*Discussion*

The United States Supreme Court has recognized that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 1).[7] *See also Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560–61 (Fed.Cir.1988). Rule 56 of the Rules of the United States Court of

---

5. While the Defendant delivered its response and cross-motion to this Court on August 25, 1997, the Court waited until the Plaintiff had refiled its initial Motion for Partial Summary Judgment before officially allowing the Clerk to file the Defendant's Response. *See supra* note 4.

6. *California Federal I* subsequently was affirmed on appeal. *California Fed. Bank, F.S.B. v. United*

States, 245 F.3d 1342 (Fed.Cir.2001) (*"California Federal II"*).

7. This Courts Rule 1(a)(2) similarly provides that its Rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."

Federal Claims ("RCFC") allows for this Court to render summary judgment in a case when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987).

An issue is genuine only if it might prompt a reasonable jury to resolve a factual matter in favor of the nonmoving party. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). A material fact is one that is relevant under the applicable law. *See id.* at 1567. Further, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. "If the evidence [of the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

When both parties have cross-moved for summary judgment, such as in the present case, each party's motion must be evaluated on its own merits, drawing all reasonable presumptions and inferences against the party whose motion is being considered. *See Mingus Constructors*, 812 F.2d at 1391. This Court is not required to grant summary judgment to one of the parties merely because both parties have moved for it; the Court has a duty to evaluate independently each party's motion on its individual merits. *See Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors*, 812 F.2d at 1391). Nevertheless, when a party has cross-moved for summary judgment on an identical issue of law, asserting that there is no genuine issues of material fact, such assertions will be taken into consideration by the Court. *See Mingus Constructors*, 812 F.2d at 1391.

The principal issue before this Court is whether or not a valid contract exists between the Plaintiff and the Defendant. The existence of a contract is a mixed question of law and fact. *See Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed.Cir.1998). Further, the United States Supreme Court has emphasized the highly factual nature of this Court's *Winstar* analysis. *Winstar III*, 518 U.S. at 860–68, 909, 116 S.Ct. 2432. *See also D & N Bank v. United States*, 331 F.3d 1374, 1378 (Fed.Cir.2003); *California Fed. II*, 245 F.3d at 1344–48. With this in mind, the Court turns to the details of the three transactions at issue in this case.

(1) The First Federal and Security Federal Transactions

■ For an agreement to be a contract within the meaning of the Tucker Act, such an agreement must meet certain requirements: "mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1326 (Fed.Cir.1997). These requirements apply equally to express and implied-in-fact contracts, though the nature of the evidence required differs for each case. *See Balt. & Ohio R.R. v. United States*, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923). If an agreement does not meet these basic requirements, then no contract has been formed. There is no substitute for meeting the basic requirements of contract formation. *See D & N Bank*, 331 F.3d at 1378. A careful review of the First Federal and Security Federal transactions indicates that Home Federal cannot demonstrate that it had met two of these critical requirements: authority and mutual intent to contract. As a result, Home Federal fails to demonstrate the existence of a contract for these two transactions.

(1) Authority of Regional Supervisory Agent at the Time of the Transaction

■ The Defendant asserts that no contract was formed regarding the treatment of goodwill in the First Federal and Security Federal transactions because the Superviso-

ry Agent who entered into these alleged agreements lacked adequate authority. It is well established that a Government official who enters into an agreement on behalf of the Government must possess sufficient actual authority to bind the Government. *See Total Med. Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997); *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *Heydt v. United States,* 38 Fed.Cl. 286, 304–05 (1997). Those who seek to enter "into an agreement with the Government take[ ] the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority." *Trauma Serv. Group,* 104 F.3d at 1325. In order to recover, a plaintiff has the affirmative burden of showing that the Government official, on whose conduct he relied, had the authority to commit the Government. *See Jascourt v. United States,* 207 Ct.Cl. 955, 521 F.2d 1406 (1975). The Plaintiff here cannot meet this burden with regard to the First Federal and Security Federal transactions.

As an initial matter, this Court must note that, contrary to the Plaintiff's assertion, *California Federal II* does not conclusively decide the authority issue that is presently before this Court. In *California Federal II,* the Federal Circuit held that they had "already answered the question of whether the FHLBB and the FSLIC have the authority to enter into contracts like these in the affirmative." 245 F.3d at 1347 (citing *Winstar II,* 64 F.3d at 1548). The authority of the FHLBB and the FSLIC, however, is not at issue here. There is no question that the FHLBB and the FSLIC had adequate authority to enter into the purported contracts. *See Globe Sav. Bank, F.S.B. v. United States,* 55 Fed.Cl. 247, 257–58 (2003).

The Plaintiff, however, has produced no evidence that the FHLBB or the FSLIC directly approved of Home Federal's plan to account for its merger with First Federal and Security Federal under the purchase method of accounting. Indeed, when the Bank Board issued its approval of these two mergers, it was on the presumption that Home Federal was to use "pooling of interests" to account for this merger. All documents sent to the Bank Board represented that Home Federal was to use the "pooling of interests" method of accounting. (Def.'s Supplemental Mem.App. 116, 117.) It was only *after* the Bank Board had approved the transactions that the Plaintiff signaled its desire to use the purchase method of accounting. The Plaintiff did not communicate its desire to change its accounting methodology directly to the Bank Board but instead restricted its communications to Mr. Muldoon, a Supervisory Agent at the regional FHLB–Cincinnati. The only documentary evidence of the Plaintiff's purported contractual agreement with the Government for the use of goodwill in these two transactions is found in two letters between Mr. Muldoon and Home Federal.

The question of central importance to this case, therefore, is whether a regional Supervisory Agent, such as Mr. Muldoon, would have possessed adequate authority at the time of the alleged agreement to enter into a contract on behalf of the Government to permit the specialized accounting treatment of goodwill. If the Supervisory Agent had been delegated the authority to enter into such an agreement by the FHLBB, it would be irrelevant whether or not the central office of the FHLBB explicitly consented to Home Federal's use of the purchase method of accounting. Alternatively, if the Supervisory Agent possessed inadequate authority, he could not have bound the FHLBB to allow Home Federal to use the purchase method of accounting, and any agreement between the FHLBB and the Plaintiff would be voidable by the Government. This question was not addressed by the *California Federal II* decision.[8]

---

8. When recently faced with the parallel question of whether or not signatories to an FHLBB approval letter possessed adequate authority to contract on behalf of the FHLBB, the Federal Circuit remanded the matter to this Court without any admonition that *California Federal II* precludes consideration of all such authority ar-

■ While an agent needs to have actual authority to bind the Government, such authority may be either express or implied. *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989). "An employee of the Government possesses express authority to obligate the Government only when the Constitution, a statute, or a regulation grants it to that employee in unambiguous terms." *Garza v. United States,* 34 Fed.Cl. 1, 18 (1995) (citing *Howard v. United States,* 31 Fed.Cl. 297, 312 (1994)). Implied authority exists "when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee." *H. Landau,* 886 F.2d at 324 (quoting J. CIBINIC & R. NASH, FORMATION OF GOVERNMENT CONTRACTS 43 (1982)).

The Plaintiff contends that 12 C.F.R. § 501.11 delegates express contractual authority to the Supervisory Agents. This section provides, in pertinent part, that a Supervisory Agent

> may act as agent of the [Bank] Board and the [FSLIC]. Said agent shall represent the Board and [the FSLIC] in supervising Federal savings and loan associations and other institutions in the Bank's district which are insured by the [FSLIC]. When, in his opinion, such action should be taken, he shall advise and endeavor to assist Federal savings and loan associations and other insured institutions in his Bank district to conduct their operations in conformity with the statutes and the rules and regulations governing them. He shall *confer and negotiate,* pursuant to instructions from the Board and the [FSLIC], with applicants and with officers, directors, members or creditors of applicant institutions, individually or in group meetings, and otherwise as the Board and the [FSLIC] may request in writing.

12 C.F.R. § 501.11 (1980) (repealed) (emphasis added). The Plaintiff asserts that the power to "confer and negotiate" included the power to enter the purported contracts at issue in this case. More specifically, the Plaintiff references an August 13, 1981 Bank Board resolution ("August 1981 resolution"), which allegedly "authorized principal supervisory agents * * * to allow thrifts to use the purchase method to account for a supervisory merger as long as the resulting thrift met the regulatory requirements after deducting goodwill." (Pl.'s Resp. to Def.'s Supplemental Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. and in Supp. of Def.'s Mot. to Dismiss and Cross–Mot. for Partial Summ. J. 43.)

■ This Court disagrees with the Plaintiff's interpretation of these regulatory documents. Neither the regulation nor the August 1981 resolution expressly conferred upon Supervisory Agents the authority to enter into the purported contracts at issue in this case. *But see California Fed. I,* 39 Fed.Cl. at 777. The language of the generic authority provision found at 12 C.F.R. § 501.11 fails explicitly to provide such agents with any express contractual authority, let alone the express authority to enter into contracts concerning supervisory goodwill. Indeed, the plain language of 12 C.F.R. § 501.11 clearly indicates the limited authority of the Bank Board's regional agents. Allowing agents to "represent * * * in supervising," to "advise and endeavor to assist," and to "confer and negotiate" is hardly a delegation of the authority to enter into contracts. While conferring and negotiating may be a precursor to entering into a contract, it is not the same thing as actually entering into a contract. Moreover, read in the context of the section as a whole, it becomes clear that "confer and negotiate" is a regulatory act, similar to "represent * * * in supervising" and "advise and endeavor to assist." In and of itself, 12 C.F.R. § 501.11 does not expressly bestow upon the Bank Board's regional agents the authority to contract.

■ Similarly, the August 1981 resolution makes no express mention of contractual authority, let alone the authority to contract for the use of the specialized accounting forbearances at issue in this case. In fact, all that the August 1981 resolution says about the delegation of authority is that such matters are to be determined in reference to two particular prior FHLBB resolutions:

gument. *See First Commerce Corp. v. United States,* 335 F.3d 1373, 1382–83 (Fed.Cir.2003).

FHLBB Resolution No. 81–90 and FHLBB Resolution No. 81–403.[9] *See* Delegation of Authority Regarding Merger Approvals, 46 Fed.Reg. 14,727 (Mar. 2, 1981); Delegation of Authority Regarding Merger Approvals, 46 Fed.Reg. 37,628 (July 22, 1981). While these documents did expand the authority of the Bank Board's regional officials to permit the use of goodwill in certain instances, neither of the two resolutions amount to an express delegation of contractual authority regarding goodwill.

■ Of course, the lack of an express delegation of contractual authority does *not* preclude the possibility that such a delegation may be implied by the regulations if such authority was "integral" to the duties assigned to the Supervisory Agents. *See H. Landau,* 886 F.2d at 324. Nevertheless, put in its proper historical context, it becomes clear that at the time of these transactions, the ability to enter into contracts regarding the specialized accounting treatment of goodwill was not yet integral to a Supervisory Agent's duties. The First Federal and Security Federal transactions occurred at a time (early 1981) when the use of goodwill by the FHLBB to encourage supervisory mergers was still a new concept. Although such implied authority clearly would be granted at a later date, the granting of goodwill in such a manner as to amount to a contract for regulatory forbearance was not yet integral to a Supervisory Agent's duties in August 1981. *Cf. Fifth Third of W. Ohio v. United States,* 52 Fed.Cl. 637, 642–43 (*"Fifth Third"*) (determining that by April 1982, Principal Supervisory Agents had implied authority to promise to allow supervisory goodwill to be included in assets).

Between the 1970's and the 1980's, the Bank Board gradually expanded the authority of its regional agents to act independent of the central Bank Board in approving mergers between regulated entities. In the mid–1970's, Principal Supervisory Agents were first given the limited authority to approve smaller bank mergers, where such transactions would have "no significant legal or eco-

nomic anticompetitive impact." Amendment Relating to Merger Applications, 41 Fed. Reg. 9,131, 9,132 (Mar. 3, 1976). As the Bank Board came to rely more and more upon mergers between healthy and troubled thrifts to remedy the savings and loan crisis, it began to grant regional Bank Board officials an even greater role in approving transactions. Between 1980 and 1981, Principal Supervisory Agents would be granted the ability to approve increasingly larger and more significant transactions. *See* 46 Fed. Reg. 14,727; Amendments Regarding Mergers, 45 Fed.Reg. 50,553 (July 30, 1980). Nevertheless, the Bank Board explicitly reserved the power to approve all mergers "instituted for supervisory reasons" to itself. 45 Fed.Reg. at 50,555. The Bank Board further explicitly "restrict[ed] field approvals of mergers in which goodwill [was] an *essential* component of net worth." 46 Fed.Reg. at 14,728 (emphasis added).

On July 22, 1981, the Bank Board generally delegated authority to Principal Supervisory Agents to approve supervisory mergers that did not "involve an agreement with [the FSLIC] or require forbearance with respect to supervisory action under the regulations." 46 Fed.Reg. at 37,629. It was only in 1982, however, that the Bank Board permitted the Principal Supervisory Agents to "agree to certain forbearances in approving supervisory mergers which are currently granted by the Board," and to "approve merger applications in which goodwill is included in assets." Delegation of Authority Regarding Merger Approvals. 47 Fed.Reg. 8,152 (Feb. 25, 1982).

An historical overview of the regulations makes clear that the Bank Board intended to liberalize its procedures to grant its field agents increasing authority to encourage and authorize supervisory mergers. This Court has no doubt that the authority to approve of the use of goodwill in such a way as to contractually bind the Government was ultimately bestowed on regional officials. Nevertheless, the Bank Board only delegated this authority slowly. Regulatory authority

---

9. While the August 1981 resolution says little about the authority issue, it does describe the

FHLBB's intended treatment of goodwill.

came first, then implied contractual authority. In August 1981, officials had regulatory authority, but they did not yet have full implied contractual authority. Such authority would only be granted when the Bank Board permitted agents to "approve merger applications in which goodwill was included in assets." 47 Fed.Reg. at 8,152. The fact that the Bank Board previously had felt it was necessary to clarify that it retained approval authority over "essential" goodwill transactions emphasizes the limited nature of any delegation.[10]

Nevertheless, the resolutions do not explicitly bar regional Bank Board officials, such as Mr. Muldoon,[11] from approving the use of goodwill in situations such as the two transactions at issue. By a strictest reading of the resolutions, goodwill was only "essential" to a transaction when "the resulting association must include goodwill to meet the net-worth requirements of 12 C.F.R. 563.13." 46 Fed.Reg. at 14,727. It appears that the Plaintiff never needed to include goodwill to meet these requirements.

By implication, however, the resolutions prior to 1982 effectively bar regional agents from *contracting* for the use of goodwill. In instances where goodwill was essential to a merger transaction, the Bank Board was doing more than just approving a merger: it was entering into a contract. This is clear from *Winstar* and its progeny. If the inclusion of goodwill was unessential to a transaction, however, the Bank Board's act was more a regulatory act than a contractual one. Thus, by implication, prior to 1982, regional Bank Board officials only had the *regulatory* authority to approve the use of goodwill. *Contracting* for the use of goodwill, where such goodwill was not essential to a transac-

tion, was not yet integral to the duties of such agents in August 1981.

■ A contract made without adequate authority is voidable. *See Empresas Electronicas Walser Inc. v. United States,* 223 Ct.Cl. 686, 688, 650 F.2d 286, *cert. denied,* 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 217 (1980). Nevertheless, institutional ratification may serve to validate an otherwise unauthorized contract. *Janowsky v. United States,* 133 F.3d 888, 891–92 (Fed.Cir.1998). Thus, the Plaintiff further argues that even in lieu of authority, the FHLBB ratified the contract.

■ As mentioned earlier, it is clear that the FHLBB had the authority to ratify such contracts. Nevertheless, the FHLBB did nothing to demonstrate its acceptance of these two purported agreements, other than to remain silent as to the Plaintiff's accounting practices. "Silence in and of itself," however, is not sufficient to establish ratification. *Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1434 (Fed.Cir.1998), *cert. denied,* 525 U.S. 1177, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999). Indeed, since it is clear than Home Federal never had any difficulties complying with the Government's capital requirements (even after the passage of FIRREA), such silence is not at all surprising. Moreover, the Plaintiff offers no evidence that the Bank Board had actual or constructive knowledge that Mr. Muldoon had attempted to enter into a contract for the specialized accounting treatment of goodwill beyond any normal regulatory allowances.

### 2. Mutual Intent to Enter into a Contract

■ In any event, the facts otherwise do not support the Plaintiff's claim for summary judgment as to the First Federal and the

---

**10.** This Court sees no direct conflict between the holding here and the holding in *Fifth Third. Fifth Third* placed great reliance on the 1982 delegation in determining that Principal Supervisory Agents had implied authority to enter into goodwill contracts. *See Fifth Third,* 52 Fed.Cl. at 643. This 1982 delegation occurred after the two transactions at issue here.

**11.** The Government also has argued that Mr. Muldoon lacked authority because he was a mere Supervisory Agent, not a Principal Supervisory Agent. While it is true that Dr. Charles Thiem-

ann, the Principal Supervisory Agent of the FHLB–Cincinnati, appears to have had almost no specific knowledge of the Home Federal transactions, it is clear from Dr. Thiemann's uncontradicted testimony that Mr. Muldoon acted with the Principal Supervisory Agent's full authority. (Pl.'s Resp. to Def.'s Supplemental Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. and in Supp. of Def.'s Mot. to Dismiss and Cross–Mot. for Partial Summ. J.App. Ex. 4 at 17–21, 23–28, 34–36, 39–40, 45–46, 53, 59, 63).

Security Federal transactions, on the basis that Home Federal had an express contract or an implied-in-fact contract with the Government regarding the specialized treatment of goodwill. Both the First Federal and the Security Federal transactions lacked an unambiguous offer and acceptance signaling a clear mutual intent to contract. Instead, the weight of the evidence demonstrates that the communications between Home Federal and the Government regarding these mergers were more akin to regulatory approval than to a contractual undertaking.

Because the transactions in these instances were unassisted mergers, the Plaintiff cannot cite to any Assistance or Supervisory Agreements entered into with the FSLIC. While the mere absence of Assistance or Supervisory Agreements is not enough to preclude a finding that contracts for the specialized treatment of goodwill may have existed, such Agreements often have provided this Court with the clearest evidence of an express contract. *See California Fed. II,* 245 F.3d at 1347. In lieu of such unambiguous documentation, this Court would next turn to any forbearance letters or Bank Board resolutions for a possible memorialization of the alleged contract. The Plaintiff, however, also cannot produce any forbearance letters or Bank Board resolutions that contain the alleged relevant contractual terms. The forbearance letter for the First Federal transaction [12] makes no mention of the use of the purchase method of accounting or of the specialized accounting treatment of goodwill. The Bank Board resolutions likewise are devoid of such references.

Instead, the only documentation that the Plaintiff can offer as proof of its purported agreement with the Government are two letters exchanged between Mr. Muldoon and Mr. Sharp, the president of Home Federal. Despite the overall lack of documentation, this Court would be willing to entertain the *possibility* that these two letters might have created a contract regarding the treatment of goodwill. Indeed, the Plaintiff asserts that Home Federal's letter "explicitly made the consummation" of the First Federal and Security Federal mergers "contingent upon the

FHLBB permitting Home Federal to treat the mergers in accordance with the purchase method of accounting," and that the Government "explicitly accepted Home Federal's request." (Pl.'s Resp. to Def.'s Supplemental Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. and in Supp. of Def.'s Mot. to Dismiss and Cross–Mot. for Partial Summ. J. 8, 10.) The plain language of the two letters, however, ultimately does not support the Plaintiff's broad contentions.

The language of the letters is that of regulatory approval and cannot be read to demonstrate mutual intent to contract and offer and acceptance. In his letter to Mr. Muldoon, Mr. Sharp, spoke of having the Bank Board "approve" his request to change his accounting methodology for the First Federal and Security Federal transactions and of the need for a "ruling" (not a contract or an agreement) from the Federal Home Loan Bank Board.

On Wednesday morning, August 5, I talked with David Bradley, Supervisory Agent–Industry Development, about the possibility of conditioning our Merger Applications with First Federal of Sevierville and Security Federal of Alcoa on a "purchase of assets" basis rather than a "pooling of interests". For profitability reasons, this proposed accounting concept would allow us to write down to market value the assets of these two associations and permit us to take the discount into income over the next ten years. The re-evaluation of assets would cause each disappearing institution to have a negative net worth which the resulting institution could establish on its books as other intangible assets that would be amortized over a forty year period. *This accounting procedure, if approved by the Federal Home Loan Bank Board, could be extremely beneficial to the resulting institution by improving its profitability significantly.*

In these uncertain times, *approval of our request* is needed and can be justified by the fact that no one is really interested today in assuming the assets and liabilities of an existing association except for the market potential. We consider the market

---

**12.** There was no forbearance letter issued in the Security Federal transaction.

a long-term asset which will benefit the association indefinitely. * * * I was advised to make our request in writing and wait for a timely *ruling* from the Federal Home Loan Bank Board before finalizing the Merger Agreements with First Federal of Sevierville and Security Federal of Alcoa.

We apologize for not giving this purchase method adequate consideration at the time of filing our Merger Applications; however, due to the economic condition of our industry, which has worsened considerably since the filing of our applications, I do not consider it advisable to consummate these mergers until we have received an answer to this request.

(Pl.'s Mot. for Summ. J.App., Ex. A5 (Letter from David Sharp, president, Home Federal, to Lawrence Muldoon, Supervisory Agent, FHLBB–Cincinnati, Aug. 7, 1981) (emphasis added)).

Mr. Sharp further described the use of the purchase method of accounting as "beneficial," not essential, to Home's profitability. He clearly states that the mergers with First Federal and Security Federal are motivated by "market potential," not the potential for obtaining goodwill in the transaction. Mr. Sharp did not threaten to pull out of the mergers in the event that this regulatory request was not approved, but he instead spoke of the necessity of receiving an answer from Mr. Muldoon prior to the consummation of the mergers. Requesting such an answer prior to consummation shows good common sense, as it would be more difficult, under generally accepted accounting principles, to justify changing his accounting methodology after the transactions had been completed than prior to consummation. Moreover, nowhere in the letter did Mr. Sharp request any assurances regarding any changes in the law concerning the use of such goodwill.

By letter dated August 25, 1981, Mr. Muldoon responded to Mr. Sharp's letter stating:

This is in response to your letter of August 7, 1981, *requesting approval* to account for the subject mergers pursuant to the purchase method of accounting rather than the pooling of interests. * * *

* * * *

On August 13, 1981, by Resolution No. 81–463, the Bank Board rescinded Memorandum R–31a, thereby requiring associations to account for goodwill resulting from merger in accordance with generally accepted accounting principles. Such revision is in line with the Bank Board's policy to allow savings and loan associations to operate in the market place as freely as possible.

We have no objection to your *request* to account for the mergers of First FS & LA of Sevierville and Security FS & LA of Alcoa by the purchase method of accounting, provided you can substantiate such accounting treatment.

(Pl.'s Mot. for Summ. J.App., Ex. A8 (Letter from Lawrence Muldoon, Supervisory Agent, FHLBB–Cincinnati to David Sharp, president, Home Federal, Aug. 25, 1981) (emphasis added)). Mr. Muldoon uses the language of a regulator and not that of a party entering into a contract. He describes Mr. Sharp's letter as a request for approval, and speaks of the Bank Board's general "policy to allow savings and loan associations to operate in the market place as freely as possible." (*Id.*) Nowhere did the letter contain any language that a sophisticated, reasonable, and responsible contracting party could construe as making a contractual commitment. Nowhere did Mr. Muldoon demonstrate any clear intention to be bound to permitting the long term amortization of Home Federal's goodwill. Indeed, Mr. Muldoon, in his letter, explicitly refers to the Bank Board's shifting treatment of goodwill by noting that in the past the Bank Board had discouraged the use of goodwill. In the very least, Mr. Sharp was put on notice that the Bank Board could and might change its position on such matters.

Of course, this Court recognizes that it is possible for regulatory documents to also be contractual in nature. The Supreme Court's *Winstar* decision is clear on this point. *See D & N Bank v. United States*, 331 F.3d 1374, 1382–83 (2003). But simply because some regulatory documents may be contracts, it does not follow that all regulatory documents are contracts. In some instances, such as

this one, a regulatory document is simply a regulatory document and nothing more.

Despite the clear regulatory language of these two documents, the Plaintiff attempts to support its claim that the documents represent a contract by using the testimony of Home Federal's representatives. While such testimony is helpful, it is not persuasive. This Court assumes that Home Federal could, in good faith, believe that there was a contract that was breached prior to filing suit in this Court.

The Plaintiff also presents the legal conclusions of two Government regulators: Dr. Charles Thiemann (Principal Supervisory Agent for FHLBB–Cincinnati) ("Dr. Thiemann") and Mr. Muldoon. Even if this Court were to ascribe greater weight to such testimony rather than the clear language of the documents, the testimony of these two regulators remains seriously flawed.

Dr. Thiemann admits that he was not involved in the decisions to allow thrifts to use goodwill capital and that he had no recollection of any of the details of the transactions at issue here. (Pl.'s Resp. to Def.'s Supplemental Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. and in Supp. of Def.'s Mot. to Dismiss and Cross–Mot. for Partial Summ. J.App. Ex. 4 at 22, 32–36.) Dr. Thiemann could not recall having seen either of the two letters that form the core of the contract claim, and he had no specific knowledge of Home Federal's treatment of goodwill. (Id. at 60–63.) Dr. Thiemann simply presented the bare legal conclusion that a binding contract existed, without recalling the underlying facts or circumstances of Home Federal's transactions. (Id. at 95–97.) Given Dr. Thiemann's lack of knowledge of the specific facts of this case, this Court places little weight upon his conclusion.

While Mr. Muldoon had specific knowledge of the facts of the case, his testimony remains ambiguous, at best. Some of the testimony cited by the Plaintiff in its briefs as evidence that Home Federal had a contract with the Government is actually from testimony with regards to other thrifts. (See, e.g., Pl.'s Resp. to Def.'s Supplemental Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. and in Supp. of Def.'s Mot. to Dismiss and Cross–Mot. for Partial Summ. J. 38 (citing Mr. Muldoon's testimony with regards to Charter Federal Savings Bank).) To the extent that Mr. Muldoon testified with regards to the specific facts of this case, his answers tend to be qualified. (Pl.'s Resp. to Def.'s Supplemental Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. and in Supp. of Def.'s Mot. to Dismiss and Cross–Mot. for Partial Summ. J.App. 2, at 211–13, 222.) The strongest statements in support of Home Federal's claims for these transactions are legal conclusions, which this Court is reluctant to rely upon. Ultimately, Mr. Muldoon's ambiguous testimony cannot overcome the clear language of the documents in this case.

Finally, this Court is troubled, as a practical matter, by the serious lack of documentation of the Plaintiff's purported contracts. This case represents one of the earliest alleged *Winstar* transactions. It seems odd that reasonable, responsible, intelligent, and sophisticated parties attempting to engage in the fairly novel act of entering into a contract for the use of goodwill as regulatory capital, forbearing any future regulatory changes, would leave such sparse documentation. However much this Court strives to divine the substance of a transaction, irrespective of form, the form of a transaction may tell something pertinent about substance. In this case, the overwhelming lack of documentation reinforces this Court's conclusion that the transaction was purely regulatory, and not contractual, in nature.

In summary, as a matter of law, the Plaintiffs have failed to make the case that the Supervisory Agent possessed actual authority to enter into a contract with the Plaintiff to treat the mergers with First Federal and Security Federal according to the purchase method of accounting. Moreover, even had Mr. Muldoon possessed adequate authority, the facts of the transactions demonstrate that he was acting wholly as a regulator when he approved of Home Federal's use of the purchase method of accounting in the First Federal and Security Federal transactions. This Court can discern no mutual intent to enter into a contract regarding the use of goodwill, and thus, no contract was formed. Accordingly, the Defendant's Mo-

tion for Summary Judgment, as it applies to the First Federal and Security Federal transactions, is hereby granted.

## II. The Second Federal Transaction

 Because Home Federal's use of the purchase method of accounting for the Second Federal transaction clearly was presented to the Bank Board, the authority issue does not apply to this transaction. While Home Federal's November 20, 1981 application to the Bank Board contained no request regarding the inclusion of goodwill, the transmittal letter asked for "all appropriate relief relative to scheduled items and net worth requirements in view of the financial condition of Second Federal of Oak Ridge." (Def.'s Supplemental Mem.App. 214.) The nature of this relief was detailed in the application package, specifically by two letters from Home Federal's vice president and treasurer, Ray Thomas, to the FHLB–Cincinnati stating, respectively that "[t]he merger will be accounted for using the purchase method which is in accordance with generally accepted accounting principles" and "Home will account for the merger using the purchase method." *(Id.* at 225, 227.) Unlike in the First Federal and the Security Federal transactions, the Bank Board was aware that Home Federal intended to use the purchase method of accounting.

Indeed, on December 24, 1981, when the Bank Board approved the merger of Home Federal and Second Federal, it specifically provided:

> That if Home [Federal] desires to use the *purchase method of accounting for the merger,* Home shall furnish an opinion from an independent accountant satisfactory to the Supervisory Agent which (a) indicates the justification under generally accepted accounting principles for the use of the purchase method of accounting for the merger, (b) specifically describe, as of the the [sic] effective date of the merger, any goodwill or discount of assets arising from the merger to be recorded on Home's books, and (c) substantiate the reasonableness of amounts attributed to goodwill and the discount of assets and the resulting amortization periods and methods.

(Pl.'s Mot. for Summ. J.App., Ex. A11 at 2 (emphasis added).) In accordance with the approval, Home Federal submitted to the FHLBB opinion letters from its accountant concerning the treatment of goodwill.

The Second Federal transaction is better documented than the First Federal or Security Federal transactions and lacks many of the key difficulties posed by the previous two transactions. From the inception, Home Federal notified the Bank Board that it intended to use the purchase method of accounting in this transaction. At the same time, it is unclear from the evidence currently before this Court whether the approval to use the purchase method of accounting was purely regulatory or was contractual in nature. It is clear that the FHLBB approved the merger, but it is not clear at this time that the FHLBB entered into a contract regarding the use of goodwill with Home Federal. As the Federal Circuit recently reminded, "[m]ere approval of the merger does not amount to intent to contract." *D & N Bank,* 331 F.3d at 1378. *See also New Era Constr. v. United States,* 890 F.2d 1152, 1155 (Fed.Cir.1989). The key question remaining to be demonstrated is whether or not these documents properly evidence a mutual intent to enter into a contract. This should be explored further in a fact-gathering trial setting.

Material facts remain to be decided. For this reason, both the Plaintiffs' Motion for Partial Summary Judgment on Liability and the Defendant's Cross–Motion for Summary Judgment are denied as to the Second Federal transaction. A trial on liability with regards to the Second Federal transaction is appropriate.

## CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Partial Summary Judgment (as to liability) is DENIED, and the Defendant's Cross–Motion for Summary Judgment (as to liability) is GRANTED IN PART and DENIED IN PART. Specifically, the Defendant's Cross–Motion for Summary Judgment is GRANTED as to the First Federal and Security Federal transactions and DENIED as to the Second Federal transaction.

694

The parties are ordered to file, on or before September 30, 2003, a status report (joint, if possible) as to their views on future proceedings regarding liability and potential damages in the Second Federal transaction.