**SOUTHERN NATIONAL CORPORATION and Branch Banking and Trust Company of South Carolina, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 95–526C.**

United States Court of Federal Claims.

Nov. 19, 2002.

Melvin C. Garbow, Arnold & Porter, Washington, D.C., attorney of record for Plaintiffs. Michael A. Johnson, Arnold & Porter, of Washington, D.C., argued for Plaintiffs. Howard N. Cayne and David B. Bergman, of counsel for Plaintiff.

Paul G. Freeborne, Trial Attorney, Commercial Litigation Branch, Department of Justice, of Washington, D.C., attorney of record and argued for Defendant. With him on the briefs were David W. Ogden, Assistant Attorney General, David M. Cohen, Director, and Mark A. Melnick, Assistant Director. John Kane, of counsel for Defendant.

**OPINION**

WILSON, Judge.

This *Winstar*-related case is before the Court on cross-motions for partial summary judgment, pursuant to RCFC 56(c), for plaintiffs' breach of contract claim. Plaintiffs claim that the government's enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. 101–73, 103 Stat. 183 (codified as 12 U.S.C.

§ 1464), breached its agreement with First Federal by requiring First Federal to deduct immediately all of the goodwill and other intangible assets arising from its acquisition of four troubled thrifts; to deduct a portion of the goodwill and other intangible assets from its core capital and risk-based capital computation; and to deduct the balance on an accelerated amortization schedule. For the reasons discussed below, the parties' cross-motions for partial summary judgment are DENIED.

## BACKGROUND

This *Winstar*-related case is one of approximately 120 cases arising from the 1980s crisis in the savings and loan industry. The history of the thrift crisis of the early 1980s and the 1989 enactment of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub.L. 101–73, 103 Stat. 183 (codified as 12 U.S.C. § 1464), is discussed in detail in *United States v. Winstar Corp., et al.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), *aff'g Winstar Corp. v. United States*, 64 F.3d 1531 (Fed.Cir.1995) (en banc), and is not recounted here.

The alleged breach of contract arises from First Federal Savings and Loan Association of South Carolina's (First Federal) 1982 acquisition of four troubled thrifts [1]: 1) Lexington County Savings and Loan Association of West Columbia, South Carolina (Lexington); 2) State Savings and Loan Association of Walterboro, South Carolina (Walterboro); 3) Chester Savings and Loan Association of

Chester, South Carolina (Chester); and 4) Standard Savings and Loan Association of Lancaster, South Carolina (Lancaster). At the time of the mergers, First Federal's net worth was approximately $22 million. (Pls.' App. In Support of Pls.' Mot. for Partial Summ. J. (Pls.' App.), Tab 55.) According to plaintiffs, the four transactions created a combined total of approximately $42 million in goodwill, based on a fair market value of $107 million in assets and $149 million in liabilities.[2]

All four acquisitions were "unassisted," i.e., the government did not provide cash assistance for First Federal to acquire the failing thrifts, and they took place without a formal assistance agreement or a supervisory action agreement. First Federal entered into formal merger agreements with each of the four troubled thrifts which were conditioned upon approval from the Federal Home Loan Bank Board (FHLBB). (Pls.' App., Tab 48.) The government issued letters conditionally approving the Lexington merger on April 28, 1982, the Lancaster merger on April 29, 1982[3], the Walterboro merger on May 26, 1982, and the Chester merger on August 13, 1982. (Pls.' App., Tabs 23–26.) Each approval letter memorialized the government's agreement to allow First Federal to exclude acquired liabilities for a period of five years for purposes of calculating First Federal's regulatory capital and its entitlement to maintain an augmented amount of Federal Savings and Loan Insurance Corporation (FSLIC)-insured deposits.[4]

---

**1.** . Plaintiff Branch Banking & Trust Company of South Carolina succeeded by merger to both First Federal and Southern National Corp. Southern National Corp. had been a related corporate identity to plaintiff Branch Banking & Trust Company of South Carolina at the time the complaint was filed, but has since ceased to exist independently.

**2.** Goodwill represents the difference in value between the troubled thrift's assets and its liabilities, i.e., the amount by which the troubled thrift was insolvent on a mark-to-market basis at the time of the transaction. *Winstar Corp. v. United States*, 64 F.3d 1531, 1536 (Fed.Cir.1995). The Lexington merger created $26.4 million in supervisory goodwill; the Walterboro merger created $2.3 million in goodwill; the Chester merger created $3.7 million in goodwill; and the Lancaster merger created $10.5 million in supervisory goodwill.

**3.** The Lancaster transaction initially utilized the "pooling" method of accounting, but ultimately it used the "purchase" method of accounting because of Lancaster's financial decline, as reflected in the supplemental approval letter dated January 11, 1983. (Pls.' App., Tab 26.)

**4.** Each approval letter contained the following language:

"For purposes of satisfying the net worth requirements of Section 563.13(b) of the Insurance Regulations, First Federal may, for a period of five years, exclude all of [each acquired institution's] liabilities, including average liabilities which are assumed by First Federal at the time of the merger." (Pls.' App., Tabs 23–26.)

In order to consummate the acquisitions, FHLBB required First Federal to provide an opinion letter from an independent accountant supporting the use of purchase method accounting under generally accepted accounting principles (GAAP), describing the amount of goodwill arising from the acquisition, and substantiating the reasonableness of the goodwill and its amortization period. (Pls.' App., Tabs 23–26.) First Federal officially completed its merger with Lancaster, Lexington, Walterboro and Chester by verifying First Federal's accounting methods, and by providing the FHLBB all pertinent information concerning goodwill, including the independent accountant letter from Peat Marwick.[5]

First Federal alleges that the government, acting through the FHLBB and the Federal Home Loan Bank of Atlanta (FHLB–Atlanta), entered into a contractual agreement with First Federal to allow it to account for the four acquisitions using the purchase method of accounting, which permits the designation of the excess of the purchase price over the fair market value of identifiable assets as an intangible asset referred to as "goodwill"; to amortize the goodwill over forty years (later modified to thirty-five years) on a "straight line" basis [6]; and to count the goodwill toward First Federal's regulatory capital requirements. Plaintiffs contend that the passage of FIRREA effectively breached plaintiffs' contractual rights to use goodwill for regulatory capital compliance purposes.

The government argues that it did not enter into a negotiated contract with First Federal, but merely approved the terms of the four mergers, including the use of purchase accounting, pursuant to existing regulations. According to the government, plaintiffs obtained the four thrifts as part of a plan to expand its business throughout South Carolina. (Def.'s App. in Supp. of Def.'s Mot. for Summ. J. (Def.'s App.) at 1702.) Any forbearance or amortization period provided to First Federal was allowed by regulation, and did not constitute a contractual promise to protect plaintiffs from the risk of future regulatory changes.

## ANALYSIS

### Summary Judgment

The Tucker Act grants this Court jurisdiction over actions founded upon any express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2000). Pursuant to Rule 56(c) of the Rules of the United States Court of Federal Claims, a motion for summary judgment will be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Genuine issues of material fact that may significantly affect the outcome of the matter preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing an absence of genuine issues of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden does not change if the matter is being examined on cross-motions. The Court must evaluate each motion in its own right and resolve any reasonable inferences against the party whose motion is being considered. A cross-motion for summary judgment is one party's claim that it alone is entitled to judgment. *First Fed. Sav. Bank*

---

**5.** The independent accountant letters (with the exception of the Lancaster accountant letter, *see* Def.'s App. in Supp. of Def.'s Mot. for Summ. J. (Def.'s App.) at 235, indicating that the pooling method of accounting was appropriate for the merger, which was later converted to the purchase method of accounting) issued by Peat, Marwick, Mitchell & Co. each state the following:

Subject to our approval of the specific details as of the actual date of the transaction, we find [the purchase method] of accounting in accordance with generally accepted accounting principles as promulgated by the AICPA and

the FASB. Specifically, based on our understanding of the terms of the merger, we believe that the business combination has the distinctive criteria described in Opinion 16 of the Accounting Principles Board, as interpreted by FASB Interpretation Number 9, and accordingly, should be accounted for as a purchase transaction as described in paragraphs 66 and 69 of said Opinion.

**6.** This method is also referred to as ratable basis, which means that the earnings of First Federal would be reduced each year by one fortieth of the amount of goodwill.

*of Hegewisch v. United States,* 52 Fed.Cl. 774, 780 (2002).

### Contract Formation

The Supreme Court in *Winstar* directed courts deciding *Winstar*-related cases to apply "ordinary principles of contract construction and breach that would be applicable to any contract between private parties." *Winstar,* 518 U.S. at 871, 116 S.Ct. 2432. "[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Massie v. United States,* 166 F.3d 1184, 1188 (Fed.Cir.1999). These general requirements apply equally to an express and an implied contract.[7] *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997).

Whether a contract exists is a mixed question of law and fact. *Cal. Fed. Bank, FSB v. United States (CalFed),* 39 Fed.Cl. 753 (1997), *aff'd,* 245 F.3d 1342 (Fed.Cir.2001), *cert. denied,* 122 S.Ct. 920, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002). If the contract terms are ambiguous, and require examination of external evidence, the matter is not appropriate for summary judgment. *Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1183 (Fed. Cir.1988). The mutuality of intent of the parties, or the lack thereof, is critical to the issue of whether a contract exists because "[a]bsent some evidence of contractual intent, no promise can be found, whether it be a promise to continue to regulate in a certain manner for a certain period of time, a promise to insure against a change in the law, or otherwise." *Fifth Third Bank of Western Ohio v. United States,* 52 Fed.Cl. 264, 270 (2002).

The Supreme Court found mutual intent to contract embodied in the documentation of the *Winstar* transactions, including express agreements in the form of assistance agreements and supervisory action agreements with integration clauses. *Winstar,* 518 U.S. at 864–66, 116 S.Ct. 2432. The Federal Circuit expanded contract liability beyond transactions involving assistance and supervisory agreements by holding that a written agreement is not necessary to find a contract with the government. *CalFed,* 245 F.3d at 1346–47. As the Federal Circuit noted:

> [I]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed.

*Id.* at 1347 (quoting *CalFed,* 39 Fed.Cl. at 773).

In *CalFed,* 39 Fed.Cl. at 773, this Court noted, and the Federal Circuit affirmed, that "[c]ontracts are not technical documents requiring certain forms. Rather, they are legal relationships imposed by the law on parties when certain functional prerequisites like intent, offer, acceptance, and consideration occur in logical sequence." The Court also has noted that regulatory documents can be construed as contractual commitments where the reality of the transaction supports such a construction. *Fifth Third,* 52 Fed.Cl. at 274. However, the burden of proving the reality of a transaction to be a contractual undertaking, as opposed to a regulatory act, remains with the plaintiffs. *Id.* at 275.

### Authority to Contract

■ A binding agreement with the government depends in part upon the actual authority of the government official to contract. *Lewis v. United States,* 70 F.3d 597, 600 (Fed.Cir.1995). Although actual authority may be expressed or implied, a contract with the government may not be based on "apparent" authority. *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir. 1989).

---

7. An "implied-in-fact" contract is one "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923).

■ The government argues that the principal supervisory agent (PSA) of the FHLB–Atlanta did not have authority to enter into a contract with First Federal and to make promises regarding the favorable treatment of supervisory goodwill. For the reasons discussed in *First Federal Lincoln Bank v. United States*, 54 Fed.Cl. 446, 452–53 (2002), the Court rejects defendant's argument and holds that the PSA had authority to bind the government to in an alleged contract in which FSLIC played no part.

### Offer And Acceptance

■ First Federal alleges that it made contractual offers to the FHLBB in the form of merger applications for the Lexington, Walterboro, Chester and Lancaster transactions, which were accepted when the FHLBB approved the mergers. Plaintiffs argue that these applications, together with the FHLBB and FHLBB's merger approvals, contain the key terms—purchase method of accounting, calculation of goodwill, utilization of goodwill to meet capital requirements and amortization of the goodwill on a straight-line basis over forty years—embodied in the resulting contract. In addition, First Federal offers contemporaneous evidence of alleged negotiations between the parties over the terms of the transactions, including telephone logs, calendars, correspondence and depositions of First Federal employees and FHLBB officials.

Plaintiffs maintain that the documentary evidence of negotiations, in light of the savings and loan crisis of the 1980s, is sufficient for the Court to find, at a minimum, an implied, if not an express, contract. Plaintiffs claim that the terms of the contract are integrated into the FHLBB approval letters, which 1) required submittal of an independent accountant's opinion letter, "(a) specifically describ[ing], as of the effective date of

merger, any intangible assets, including goodwill, or discount of assets arising from the merger to be recorded on books, and (b) substantiat[ing] the reasonableness of amounts attributed to intangible assets, including goodwill, and the discount of assets and the related amortization periods and methods"; and 2) allowed First Federal to exclude for five years all of the acquired thrifts liabilities for the purpose of satisfying the net worth requirements of Section 563.13(b) of the Insurance Regulations. Plaintiffs argue that these two paragraphs of the FHLBB approval letters documented the government's acceptance of First Federal's offer to use purchase method accounting and record goodwill as an asset in order to satisfy regulatory capital requirements. Significantly, the five-year forbearance of net worth liabilities was otherwise available only through an agreement concerning a supervisory transaction.[8]

To substantiate plaintiff's view of the merger documentation as evidence of First Federal's offer and the government's acceptance, plaintiffs highlight an April 7, 1982 letter from the presidents of First Federal and Lexington to Supervisory Agents Cohrs. The letter contains a handwritten annotation that "[t]his request to Bob Cohrs & [is] accepted!" (Pls.' App., Tab 21). However, although the letter mentions the use of purchase method of accounting and a ten-year net worth forbearance, it makes no reference to amortization periods.

The government argues that whether First Federal had a contractual agreement with the FHLBB for the amortization of goodwill is, at a minimum, a genuine issue of material fact. As the Court in *Advance Bank, FSB v. United States* noted, "one cannot infer liability from the mere statement in the ... conditional approval letter requiring an accountant's letter consistent with GAAP since virtually all business entities are re-

---

8. There are two different forbearances at issue. One is the five-year liability exclusion, which is not being contested before the Court. *See* Pls.' App., Tab 31 (OTS confirming to Milton Futch, Executive Vice President of First Federal, that First Federal was granted forbearance for the purpose of satisfying net worth requirements, but how FIRREA would effect other regulatory im-

plications and treatment of goodwill remained unclear). The other form of forbearance is the permission to allow assets to be recorded on First Federal's books and amortized over a period of time. Plaintiffs distinguish the Standard transaction in *Anchor* by stating that Standard, unlike First Federal, did not request and did not receive forbearance. (Tr. at 40–41.)

quired to comply with such standards." 52 Fed.Cl. 286, 289 (2002).

Plaintiffs argue that, pursuant to FHLBB Memorandum R31(b), identification of the amortization period was left to the accountant letter which was to be provided at a later time. However, the Peat Marwick letters filed in connection with First Federal's mergers do not mention a specific amortization period other than the period permitted by Accounting Principles Board Opinion (APB) No. 16. Instead, they merely state that the mergers satisfy criteria which qualify the transactions for purchase method accounting, and that the goodwill arising from the transactions would be amortized on a straight-line basis in accordance with the guidelines and would *not exceed* forty years (as opposed to specifically requesting forty years). (Pls.' App, Tabs 38, 29, 48, 50, 55.) Plaintiffs argue that because the Peat Marwick opinion letter, submitted with each merger application, refers to APB No. 16, which in turn cross-references APB No. 17,[9] the forty-year amortization period is incorporated by reference into the merger agreements. Plaintiffs maintain that the FHLBB merger approvals not only approved First Federal's acquisition of the four failing thrifts, but also implicitly approved the amortization of the created goodwill.

GAAP permitted regulators to allow financial institutions to amortize goodwill over a period not to exceed forty years. By 1985, pursuant to Staff Accounting Bulletin (SAB) No. 42A, GAAP advised that the forty-year period should not be granted without reasonable justification by the acquiring institution.[10]

Plaintiffs, citing FHLBB Memorandum SP–24, contend that the approval letters were not required to state a specific amortization period because the amortization period was to be addressed in the subsequently filed independent accountant letter. (Def.'s App. at 1174–1201.) In support of their position that the forty-year amortization period was a bargained-for contract term, plaintiffs highlight a 1986 mutual-to-stock transfer offering circular which was filed with the FHLBB for regulatory approval of a May 1986 sale of its common stock. (Def.'s App. at 1337–1425.) Upon review of the circular, the FHLBB requested First Federal to reduce its amortization period from forty to twenty-five years in accordance with SAB 42A. Ultimately, First Federal reduced the amortization period from forty to thirty-five years. (Compl., ¶¶ 32–33.)

Defendant contends that it is counterintuitive that plaintiffs "did not stand on their contract rights" if they had earlier bargained for a forty-year amortization period. (Def.'s Mot. for Summ. J., at 29.) Plaintiffs respond that, in order to expedite the stock sale, First Federal made a business decision to negotiate for the thirty-five year period rather than sue the government over First Federal's alleged contractual right to forty-years. (Tr. at 47.)

---

9. Accounting Principles Board Opinion No. 17 (1970), at 228, states:

The period of amortization of intangible assets should be determined from the pertinent factors ... Analysis of all factors should result in a reasonable estimate of the useful life of most intangible assets ... *The period of amortization should not, however, exceed forty years....* A company should evaluate the periods of amortization continually to determine whether later events and circumstances warrant revised estimates of useful lives. If estimates are changed, the unamortized cost should be allocated to the increased or reduced number of remaining periods in the revised useful life but not to exceed forty years after acquisition. (Emphasis added.)

10. Staff Accounting Bulletin No. (SAB) 42A (Dec. 31, 1985), at 2–4 states:

The SAB went on to note that the automatic selection of the maximum 40 year amortization period allowed by generally accepted accounting principles is not appropriate ... while SAB No. 42 did not specify a maximum acceptable goodwill life, practice evolved to the point where the maximum goodwill life that could be justified to the staff was 25 years ... *With respect to selection of the appropriate amortization period for goodwill acquired in business combinations after December 23, 1981, the automatic selection of a 40 year amortization period is not appropriate; therefore, a new registrant should be prepared to justify the use of a long amortization period* ... For business combinations initiated after September 30, 1982, the staff believes that 25 years is the maximum goodwill life that is acceptable. (Def.'s App. at 1437–39; emphasis added.)

Plaintiffs contend that their transactions are supported by the same documentary evidence examined by the Court in *CalFed.* However, unlike *CalFed,* where the acquiring institution made a specific written request to the FHLBB for "purchase method accounting using the straight line method over the estimated useful life of 35 years," there is no evidence in the form of a forbearance letter or FHLBB resolution confirming the lengthened amortization period. Moreover, First Federal has not provided documentation supporting a request for a lengthened amortization period prior to governmental approval of the mergers. The only evidence of plaintiffs' desire for a longer amortization period is reflected in internal correspondence between First Federal and Peat Marwick (Def.'s App. at 420, 532, 751, 867, 977) and correspondence *after* the merger approvals. (Pls.' App., Tab 50).

Finally, plaintiffs analogize their First Federal transactions with the Glendale transaction at issue in *Winstar,* in which the only references to goodwill in the documents were contained in the FHLBB resolution, which conditioned approval on the requirement that Glendale justify the amount of goodwill and its amortization to the FHLBB's satisfaction, and the accountant letter submitted in response. *Winstar,* 64 F.3d 1531, 1541 (Fed. Cir.1995). Plaintiffs also analogize their mergers to the Peachtree and Crisp transactions at issue in *Anchor Savings Bank, FSB v. United States,* in which the Court found a binding promise to treat goodwill toward regulatory capital requirements, but only after determining the most important document to be the forbearance letter. 52 Fed.Cl. 406, 411 (2002).

The Glendale, Peachtree and Crisp transactions at issue in *Winstar* and *Anchor* are in some ways factually distinguishable from the First Federal transactions. Unlike the Glendale transaction in *Winstar,* First Federal's transactions were not memorialized by means of Supervisory Actions Agreements, resolutions, and integration clauses. *See Winstar,* 64 F.3d at 1537–40. The Peachtree and Crisp transactions in *Anchor* also were facilitated by assistance agreements, FHLBB resolutions and forbearance letters.

52 Fed.Cl. at 414. In contrast, First Federal's four transactions were unassisted and lacked Supervisory Agreements, resolutions, and integration clauses.

The Court in *First Commerce Corp. v. United States* addressed a similar argument that a combination of various documents created a contractual agreement. 53 Fed. Cl. 38 (2002). The plaintiff in *First Commerce* argued that its bid letter, merger application, FHLBB approval letter, forbearance letter and the accountant's confirmation letter should be read together to constitute a specific request for a twenty-five year amortization period, and more importantly, a "meeting of the minds regarding both the regulatory treatment of the goodwill and the [twenty-five year] amortization period." 53 Fed.Cl. at 44 (citation omitted). The Court held that First Commerce's application contained no specific request to receive a lengthened amortization period and therefore did not support mutual intent to contract. *Id.*

The Court recently held in *LaVan, et al. v. United States* that special approval of the push-down method of accounting, compared to GAAP methods of accounting such as "pooling" or "purchase" accounting, supported a finding of an implied-in-fact contract. 53 Fed.Cl. 290 (2002). The Court found that a special request to deviate from GAAP in the treatment of goodwill was critical to the agreement between FHLBB and the acquirers because this special accounting treatment was necessary to make the conversion from mutual to stock association viable, and that the facts and circumstances surrounding the approval of the conversion established a bargained-for agreement. *Id.* at 298–99. In this case, First Federal's use of purchase accounting in accordance with GAAP (in contrast to *LaVan*) does not definitively answer the question whether the four transactions were contractual or regulatory in nature.

Courts have noted that a "regulatory act of approval is ordinarily a statement that the conduct conforms with existing law or policy and no more. Absent some contractual intent, no promise can be found." *Fifth Third,* 52 Fed.Cl. at 270; *Winstar,* 518 U.S. at 913,

116 S.Ct. 2432 (Breyer, J., concurring). Here, First Federal has not provided undisputed evidence that there was an "agreement" embodying mutuality of intent with the government for a specific amortization period. Although GAAP permitted a forty-year amortization period, the Supreme Court in *Winstar* found that "the accounting treatment to be accorded supervisory goodwill and capital credits was the subject of *express arrangements* between the regulators and the acquiring institutions." *Winstar*, 518 U.S. at 853, 116 S.Ct. 2432 (emphasis added). Plaintiffs argue that the approval letters and accountant letters are presented "in the context of something that we know is an agreement," and, therefore, create a contract. (Tr. at 55.) In light of the disputed evidence discussed below, whether or not such "express arrangement" existed in this case remains a genuine issue of material fact, and summary judgment is therefore precluded.

### Consideration

Plaintiffs allege that, as a result of the savings and loan crisis of the 1980s, the government pursued a policy of inducing "healthy" financial institutions to acquire failing thrifts in exchange for supervisory goodwill forbearance. According to plaintiffs, consideration took the form of cash assistance and/or promises to permit financial institutions to engage in certain accounting practices that permitted the calculation and use of goodwill to meet regulatory capital requirements. However, "[t]he fact that the Government may have been willing to encourage a given transaction by promising certain regulatory treatment does not eliminate the dispute as to whether it actually made such a promise. The Court of Federal Claims cannot imply a contract as a legal conclusion where no such contract exists as a matter of fact." *Fifth Third*, 52 Fed.Cl. at 277.

In addition to merger documentation, First Federal relies on economic circumstances to establish contractual intent. Without goodwill, First Federal would have had a negative net worth of approximately $20 million, resulting in First Federal immediately falling into regulatory noncompliance. (June 27, 2002 Oral Argument Transcript (Tr.) at 56–57.) The fact that a transaction may constitute "madness" absent special regulatory treatment does not establish the existence of a contractual promise. *Winstar*, 518 U.S. at 910, 116 S.Ct. 2432; *Fifth Third*, 52 Fed.Cl. at 275; *CalFed*, 39 Fed.Cl. at 767. The question is "whether each party would have engaged in the transaction absent the existence of a binding contract—insolvency is not the determinative factor." *CalFed*, 39 Fed. Cl. at 768. The government counters First Federal's financial circumstances argument by contending that First Federal acquired the thrifts as part of a business plan to "carve up" South Carolina as part of its method of expansion to ensure its financial survival. (Tr. at 68; Def.'s App. at 1702.) The government suggests that First Federal would have entered into the transaction with the two thrifts regardless of the forbearance and amortization of goodwill. Plaintiffs point out that incidental benefits to the acquiring institution do not negate the existence of a bargained-for agreement. The Court finds that the parties' dispute over First Federal's economic circumstances at the time of the mergers, as well as over the parties' intentions in connection with the acquisitions creates a genuine issue of material fact precluding summary judgment. As in *Fifth Third*, "[t]he court deems this contextual evidence particularly relevant where the only communications between the parties occur during a process of regulatory approval." 52 Fed.Cl. at 275.

### Other Evidence

Plaintiffs rely heavily on the surrounding circumstances and contemporaneous correspondence between First Federal and FHLBB officials to support their position that First Federal had a bargained for promise from the FHLBB for special regulatory treatment of goodwill. *See CalFed*, 245 F.3d at 1347 (recognizing the existence of extensive negotiations as further evidence of the intent of the parties to use goodwill for regulatory purposes); *First Commerce*, 53 Fed. Cl. at 48 (citing *Fifth Third*, 52 Fed.Cl. at 277) ("In the regulatory context, negotiations can indicate that the parties are embarking on more than the ordinary course of regulations.")

Plaintiffs have provided substantial evidence of alleged negotiations between the parties supporting intent to contract. Specifically, plaintiffs direct the Court's attention to Supervisory Agent Cohrs's telephone logs, which contain notations indicating that multiple meetings took place between Cohrs and First Federal about the failing thrifts. (Pls.' App., Tabs 10, 13–16, 22.) During oral argument, plaintiffs' counsel argued that the content of these telephone conversations involved putting "a deal together." (Tr. at 32.) Plaintiffs glean from a telephone log and appointment calendar that First Federal's Chief Executive Officer, H. Ray Davis discussed a "proposition" concerning "Lexington Co[unty]" with Cohrs and scheduled a meeting concerning the "proposition" for March 5. (Pl's App., Tab 10). First Federal argues that these inferences and indicia of negotiations were confirmed by an April 7, 1982 letter from H. Ray Davis, President of First Federal and Jack G. Hendrix, President of Lexington, and by deposition testimony of First Federal and FHLBB representatives. (Pls.' App., Tab 20.) *See* Pls.' App., Tab 2 at 696 (Deposition of Thurman Connell of FHLBB, stating he believed there was an "agreement" with FHLBB to permit First Federal to "count the supervisory goodwill as an element of its regulatory capital"); Pls.' App., Tab 3 at 28, 37–38 (Deposition of Milton Futch, Chief Financial Officer of First Federal, testifying that the PSA and FHLBB, through conversations and merger documents, agreed that First Federal would be able to count the goodwill created in the Lexington merger for regulatory purposes, and that First Federal was granted a five-year net worth forbearance).

The government, however, contends that the available evidence of negotiations is insufficient to support finding of a contract. As in *Fifth Third*, the government disputes the intent and substance of these negotiations based on conflicting deposition testimony. For example, although the government does not contest that Connell of the FHLBB testified that he understood that there was an agreement, the defendant highlights Connell's admission that he was not personally involved in the four acquisitions, and could not recall any extended discussions relating to the method of accounting or amortization period. (Pls.' App., Tab 2 at 696–67; *see also* Tr. at 70 ("[Mr. Futch's] testimony was based on something that was purportedly told to him by Mr. Davis. Mr. Davis had no specific recollection of any such quid pro quo.").) The parties' reliance on deposition testimony and other disputed external evidence to prove or disprove mutual intent to contract requires the Court to make credibility determinations and weigh evidence, which it may not do when ruling on summary judgment motions. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## CONCLUSION

The Court has the discretion to deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. In *Winstar* and *CalFed*, plaintiffs prevailed after "the court conducted a thorough examination of the record, including documents generated during the process of obtaining regulatory approval of the transaction, negotiations between the parties, and surrounding economic circumstances." *Fifth Third*, 52 Fed.Cl. at 271. Based on the existence of genuine issues of material fact regarding the parties' mutual intent to contract, the cross-motions for partial summary judgment on liability are DENIED. A trial is necessary to make factual findings regarding the parties' communications and the economic circumstances surrounding the Lexington, Walterboro, Chester, and Lancaster transactions. The parties shall file a joint status report on or before December 6, 2002 proposing a schedule for further proceedings in this matter.

**IT IS SO ORDERED.**