### HOME FEDERAL BANK OF TENNESSEE, F.S.B.,

v.

### The UNITED STATES.

### No. 95–541C.

United States Court of Federal Claims.

Sept. 8, 2004.

Thomas M. Buchanan, Washington, DC, for the plaintiff. Eric W. Bloom, Charles B. Klien, and Lewis C. Foster, of counsel.

Luke Levasseur, Washington, DC, with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for the defendant. Maureen A. Delaney, Department of Justice, of counsel.

## OPINION

YOCK, Senior Judge.

This is a *Winstar*-related breach of contract case. *See Winstar Corp. v. United States,* 25 Cl.Ct. 541 (1992) (*"Winstar I"*), *aff'd,* 64 F.3d 1531 (Fed.Cir.1995) *(en banc )* (*"Winstar II"*), *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*"Winstar III"*). Before the Court is a renewed cross-motion for summary judgment (on liability). The motion has been fully briefed, and the Court finds oral argument is unnecessary. For the reasons set forth below, the Defendant's Renewed Cross–Motion for Summary Judgment is GRANTED.

### *Background*

A. Regulatory and Procedural Setting

This case is one of many arising from the Government's efforts to address problems that arose with thrift banking institutions ("thrifts") during the 1980's and early 1990's. A detailed account of the situation in that banking sector during that time and after the enactment in 1989 of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of title 12 of the U.S.Code, including 12 U.S.C. § 1464 (2000)), is provided in *Winstar III.*

To summarize that situation, high interest rates and inflation in the late 1970's and early 1980's led to thrifts losing money on a continuing basis because the cost of deposits exceeded revenues from long-standing, fixed-rate, low-interest mortgages. *Winstar III*, 518 U.S. at 845, 116 S.Ct. 2432. The pertinent regulatory agencies, the Federal Home Loan Bank Board ("FHLBB" or "Bank Board"), which chartered and regulated thrifts, and the Federal Savings and Loan Insurance Corporation ("FSLIC" or "Corporation"), which insured the deposits held by thrifts, responded, in relevant part, by often encouraging financially stronger banking institutions to merge with or to take over weak thrifts, sometimes with cash infusions from FSLIC, and typically with forms of assistance other than cash from the Bank Board. *Id.* at 846–51, 116 S.Ct. 2432.

A primary means by which the Bank Board assisted and promoted such mergers was through regulatory accounting of "supervisory goodwill." The Bank Board permitted the use of the purchase method of accounting for a "supervisory merger," recognizing as goodwill the excess of the fair market value of the liabilities assumed over the fair market value of the assets acquired. This goodwill would be deemed regulatory capital, *id.* at 850–51, 116 S.Ct. 2432, rather than an intangible asset that would not count toward the merged bank's regulatory capital as the Bank Board otherwise would have treated goodwill of this type.[1] Further, the Bank Board allowed amortization of the supervisory goodwill over a period of years that frequently exceeded the life of the underlying asset-typically comprised of the mortgages held by the thrift acquired in a supervisory merger. *Id.* at 851–53, 116 S.Ct. 2432.

"[This] treatment of supervisory goodwill as regulatory capital was attractive [to potential acquiring institutions] because it inflated the institution's reserves, thereby allowing the thrift to leverage more loans (and, it hoped, make more profits)." *Id.* at 851, 116 S.Ct. 2432.

These measures by the Bank Board and FSLIC encouraged banking entities to take over failing thrifts but did not require FSLIC to expend cash. The hope and expectation of the Bank Board and FSLIC was that the regulatory treatment of supervisory goodwill as a capital asset would provide a bridge over the time it would take for inflation to abate and for a better balance to be achieved between costs of deposits and revenues from long-term loans. *Id.* at 845–48, 116 S.Ct. 2432. Thus, potential thrift failures would be averted and the direct monetary costs to the Government would be minimized. Continuing financial difficulties in the industry, however, led to the enactment of FIR-REA on August 9, 1989, which, among other things, required financial institutions to maintain minimum regulatory-capital requirements without regard to such intangibles as supervisory goodwill. *See* 12 U.S.C. § 1464(t). Disallowance of such regulatory capital caused numerous banks that had merged with troubled or failed thrifts to file actions in this Court asserting claims primarily founded on breach of contract theories.

On August 8, 1995, Home Federal Bank of Tennessee, FSB ("Home Federal" or the "plaintiff") filed a Complaint in this Court against the United States (the "defendant" or the "Government") alleging breach of contract, breach of contract implied in fact, and uncompensated Fifth Amendment takings.[2]

---

1. In 1981 and 1982, Generally Accepted Accounting Principles ("GAAP") allowed two methods of accounting for mergers and acquisitions: either "purchase of assets" or "pooling of interest." Under the pooling method, the previously "separate businesses are combined and future operating results are based on the original amounts of the respective assets and liabilities." *First Fed. Lincoln Bank v. United States*, 54 Fed. Cl. 446, 448 n. 4 (2002). In contrast, the purchase method leaves unchanged the accounting of the purchasing entity but "revalues the assets and liabilities of the acquired entity from their

original book value to their market value at the time of the acquisition * * *." *Id.*

2. The plaintiff's case centers upon three separate transactions during the early 1980's in which it acquired three financially-troubled, federally-insured savings and loans. The plaintiff alleges these transactions involved *Winstar*-type contractual promises by the Government to allow the specialized accounting treatment of supervisory goodwill and that these promises were breached by the Government as a result of subsequent federal legislation. The three transactions involved are as follows: First, Home Federal's

The plaintiff subsequently withdrew its Fifth Amendment takings claim, and judgment was entered striking this claim (Count III) from the Complaint. *See* Court Order and Judgment filed Feb. 28, 2002. On July 14, 1997, Home Federal had filed Plaintiff's Motion for Partial Summary Judgment (as to liability) in regard to its contract claims (Counts I and II). On September 18, 1997, the Government responded to the plaintiff's motion and filed the Defendant's Cross–Motion for Summary Judgment (as to liability). Various motion-related filings and procedural activities followed, including the reassignment of this case to the present judge on February 1, 2002. On August 26, 2003, this Court issued its Opinion by which it denied the Plaintiff's Motion for Partial Summary Judgment (as to liability in all three of the transactions involved in this case), and granted in part and denied in part the Defendant's Cross–Motion for Summary Judgment (as to liability in the three transactions).

Specifically, this Court granted the Defendant's Cross–Motion for Summary Judgment as to the first two transactions, that is, the First Federal and Security Federal transactions, but denied the defendant's cross-motion as to the third transaction, that is, the Second Federal transaction. The Court granted summary judgment as to the First Federal and Security Federal transactions based upon its findings that: (1) Principal Supervisory Agents ("PSA's") of the Bank Board did not possess contractual authority to " 'approve merger applications in which goodwill was included in assets' " until February 25, 1982, and that "the resolutions prior to 1982 effectively bar[red] regional agents from *contracting* for the use of goodwill," *Home Fed. Bank of Tenn., F.S.B. v. United States*, 57 Fed.Cl. 676, 689 (2003), and (2) with respect to those two transactions it could "discern no mutual intent to enter into a contract regarding the use of goodwill, and

thus, no contract was formed," *id.* at 692. As to the Second Federal transaction, this Court believed that, based upon the factual record then before it, a fact-finding trial on liability was appropriate. In particular, the record suggested that Home Federal's intent to use the purchase method of accounting with respect to the Second Federal merger may have been known and approved by the central Bank Board and not just the pertinent PSA.[3]

On September 10, 2003, the defendant filed a motion for reconsideration arguing that the Court also should have granted summary judgment with respect to the Second Federal transaction. In that motion, the defendant alleged that "the Court made an understandable factual mistake with respect to the regulatory approval of the 'Second Federal' transaction, which (in conjunction with its authority analysis) resulted in the erroneous denial of our summary judgment motion with respect to that transaction." Def.'s Mot. for Reconsideration at 1. Specifically, the defendant argued that summary judgment also should have been granted as to the plaintiff's claims related to the Second Federal transaction based on the factual assertion that all of the relevant governmental actions were undertaken solely by regional regulatory officials that, based on this Court's earlier findings, lacked authority to contractually bind the United States to a *Winstar*-type agreement. The defendant also disagreed with the Court's finding that the Bank Board, which had the authority to contractually bind the United States in these transactions, may have been involved directly in the approval of the Second Federal transaction, including authorizing the use of the purchase method of accounting. On September 26, 2003, the motion for reconsideration was denied based on the Court's finding that its August 26, 2003 Opinion was factually sound and that the defendant did not identify any grounds that

merger with First Federal Savings and Loan Association ("First Federal"); second, Home Federal's merger with Security Federal Savings and Loan Association ("Security Federal"); third, Home Federal's merger with Second Federal Savings and Loan Association ("Second Federal").

3. The Court also found that "it [wa]s unclear from the evidence [then] before this Court whether the approval to use the purchase method of accounting was purely regulatory or was contractual in nature" and that it believed the "[t]he key question remaining to be demonstrated is whether or not these documents properly evidence a mutual intent to enter into a contract." *Home Fed. Bank of Tenn.*, 57 Fed.Cl. at 693.

would compel the Court to revisit that decision.

On October 10, 2003, the parties timely filed their Court-ordered Joint Status Report. In that report, it was stated that:

after analyzing the documentary and testimonial record in this case, Plaintiff agrees with the factual representations set forth in the Government's September 5, 2003 motion for reconsideration, *i.e.*, that Home Federal's application to effect the Second Federal acquisition was considered and approved exclusively by the Principal Supervisory Agent ("PSA") in the Cincinnati, Ohio Federal Home Loan Bank. Accordingly, while reserving its right to appeal the Court's legal rulings, Plaintiff recognizes that the Court should enter final judgment on behalf of Defendant and against Plaintiff. Defendant concurs with this position.

Joint Status Report, Oct. 10, 2003, at 1. The Joint Status Report also states that:

Both parties * * * agree that the Plaintiff's claims concerning the "Second Federal" transaction would also be barred as a matter of law under [this Court's August 26, 2003] holding. As discussed in Defendant's Motion for Reconsideration, the PSA, not the Federal Home Loan Bank Board itself, reviewed and approved the "Second Federal" transaction in December 1981. Accordingly, like the "First Federal" and "Security Federal" transactions, the "Second Federal" transaction occurred before the effective date of the Bank Board regulations found by this Court to delegate contractual authority to regional agents.

On September 26, 2003, this Court denied Defendant's Motion for Reconsideration upon the ground that it did not satisfy the traditional reconsideration elements. The parties, however, agree that Plaintiff's claims in connection with the "Second Federal" transaction are not factually distinguishable for purposes of the Court's analysis of the authority issue, and that a trial is unnecessary.

Accordingly, the Parties jointly request that the Court grant Defendant's Cross–Motion for Summary Judgment concerning the "Second Federal" transaction based upon the Court's August 26, 2003 Opinion, and enter final judgment on behalf of Defendant in this matter.

*Id.*, at 2–3 (footnote omitted).

On October 21, 2003, this Court issued an order noting with interest the parties' factual assertions and admissions as well as their request that summary judgment be entered with respect to the Second Federal transaction. It also noted, however, that it would "neither revisit its prior rulings nor rule on any improperly made implied motions." Order of Oct. 21, 2003, at 2. But, based upon the new factual concessions and party admissions contained within the Joint Status Report, the Court further concluded that summary judgment would appear proper with respect to the claims arising from the Second Federal transaction if the defendant (or the parties jointly) established undisputedly that the Bank Board had no involvement in that transaction, either by negotiation, approval, or any act of ratification.[4] It therefore invited the parties to file or refile a motion for summary judgment supported by a joint stipulation of facts.

On December 23, 2003, Defendant's Renewed Cross–Motion for Summary Judgment (as to liability) and the parties' Joint Stipulation of Facts were filed. On January 23, 2004, Plaintiff's Response to Defendant's Renewed Cross–Motion for Summary Judgment was filed; on February 2, 2004, Defendant's Reply Memorandum in Support of its Renewed Cross–Motion for Summary Judgment was filed.

### B. The Merger Transaction at Issue (i.e., the Second Federal Transaction)

Prior decisions in this case set forth the facts in detail. In particular, this Court provided a detailed discussion of the facts in its

---

4. Specifically, the Court noted that "[i]f these facts are established and undisputed by both parties, then summary judgment would appear proper because the relevant thrift supervisory official involved in the Second Federal transaction, acting alone, lacked authority to contractually bind the Government in that transaction." Order of Oct. 21, 2003, at 2.

August 26, 2003 Opinion, *Home Fed. Bank of Tenn.*, 57 Fed.Cl. at 676, which is incorporated herein. For a more detailed discussion of the facts, the parties are referred to that Opinion. Included here are only those facts necessary for this decision, which are drawn from the Complaint, the parties' cross-motions for summary judgment and supporting filings, their Joint Status Report, Defendant's Renewed Cross–Motion for Summary Judgment (as to liability), the parties' Joint Stipulation of Facts, Plaintiff's Response to Defendant's Renewed Cross–Motion for Summary Judgment, Defendant's Reply Memorandum in Support of its Renewed Cross–Motion for Summary Judgment, and the appendices attached thereto.

Second Federal Savings and Loan Association ("Second Federal") was a federally-insured savings and loan institution located in Oak Ridge, Tennessee. On November 19, 1981, Home Federal executed a merger agreement with Second Federal. The merger was to be effective as of December 31, 1981. On November 20, 1981, Home Federal sent to Mr. Lawrence Muldoon, Supervisory Agent, FHLBB–Cincinnati an application

seeking approval of its merger with Second Federal.[5] The application contained no explicit request regarding the inclusion of goodwill, although the transmittal letter to the Supervisory Agent asked for "all appropriate relief relative to scheduled items and net worth requirements in view of the financial condition of Second Federal of Oak Ridge." Def.'s Supplemental Mem., Oct. 10, 2000, at App. 214. The application also was accompanied by two letters from Home Federal's Vice President and Treasurer, Mr. Ray Thomas, to the FHLB–Cincinnati stating, respectively, that "[t]he merger will be accounted for using the purchase method which is in accordance with generally accepted accounting principles," *id.* at 225, and "Home will account for the merger using the purchase method," *id.* at 227.

On December 24, 1981, Mr. Charles Lee Thiemann, Principal Supervisory Agent, issued Resolution V–T–M–81–16, dated December 24, 1981, conditionally approving the merger of Home Federal and Second Federal.[6] This Resolution provided:

> That if Home Federal desires to use the purchase method of accounting for the

---

5. The parties note: "Although the preprinted 'Application For Merger' form that Home Federal submitted to the regulators had the words 'Federal Home Loan Bank Board' ('FHLBB') and a 'Washington, D.C.' address typed across the top of the document * * *, pursuant to applicable regulations, Home Federal actually sent the application to a regional regulatory official, Mr. Lawrence B. Muldoon, of the Federal Home Loan Bank of Cincinnati, Ohio ('FHLB–Cincinnati') * * *." Joint Stipulation of Facts, Dec. 23, 2003, at 1.

6. The parties state: "Although the FHLB–Cincinnati's approval document bears the words 'Federal Home Loan Bank Board' across the top * * *, the record makes clear that it was signed by [Principal Supervisory Agent] Thiemann, of the FHLB–Cincinnati." Joint Stipulation of Facts, Dec. 23, 2003, at 2.

In its Motion for Reconsideration, the Government noted that "the initial regulatory approval of the First Federal acquisition (under the pooling method) [dated August 6, 1981] was signed by Mr. J.J. Finn, Secretary to the Bank Board, and bore a docket number ('81–441') typical of formal FHLBB actions; in other words, that approval was issued by the FHLBB itself. In contrast, the original (pooling method) regulatory approval document for the Security Federal transaction, *like the Second Federal acquisition,*

bore 'FEDERAL HOME LOAN BANK BOARD' *across the top but was issued by the regional supervisory agent, Mr. Thiemann.* Although it is not material to the ultimate resolution of this motion, we respectfully note that the Court's opinion [ ] does not accurately reflect that the original approval of the Security Federal transaction was issued by the regional supervisory official." Def.'s Mot. For Reconsideration at 3–4 n. 2 (internal citations omitted) (emphasis added). In addition to noting that the regulatory approval for the Second Federal transaction was issued by the regional supervisory agent, the defendant points out that the initial approval for the First Federal acquisition was based upon an application that provided for the pooling method. Home Federal's subsequent request to use the purchase method of accounting following the First Federal merger was sent directly to Supervisory Agent Muldoon on August 7, 1981. Def.'s Oct. 10, 2000 Supplemental App. at 34–35. Regulatory approval of the request was indicated by Mr. Muldoon on August 25, 1981, *id.* at 36, and there is no evidence that the regulatory approval materials were sent to the Washington, D.C. office of the FHLBB in order to obtain approval. Thus, the proper analysis is focused on whether or not the supervisory officials had contracting authority at the time of the First Federal, Security Federal, and Second Federal transactions, i.e., prior to February 25, 1982.

merger, Home shall furnish an opinion from an independent accountant satisfactory to the Supervisory Agent which (a) indicates the justification under generally accepted accounting principles for the use of the purchase method of accounting for the merger, (b) specifically describe, as of the effective date of the merger, any goodwill or discount of assets arising from the merger to be recorded on Home's books, and (c) substantiate the reasonableness of amounts attributed to goodwill and the discount of assets and the resulting amortization periods and methods.

Pl.'s Mot. for Summ. J.App., Ex. A11 at 2. According to the parties, "Home Federal's application to acquire Second Federal was not forwarded to the Washington, D.C. office of FHLBB prior to the December 24, 1981 *regulatory approval* of the transaction." Joint Stipulation of Facts, Dec. 23, 2003, at 2 (emphasis added).[7] After receiving this conditional approval, Home Federal's merger with Second Federal was completed on December 31, 1981. Joint Stipulation of Facts, Dec. 23, 2003, at 2.

Roughly one month later, on January 29, 1982, in accordance with the Resolution V–T–M–81–16, Home Federal's independent accountant sent a letter to Mr. Muldoon justifying and describing the use of the purchase method of accounting for the merger with Second Federal. Pl.'s Mot. for Summ. J.App., Ex. A12 (Letter from Charles White, CPA, Pugh & Co. to Lawrence Muldoon, Supervisory Agent, FHLBB–Cincinnati, Jan. 29, 1982). On February 5, 1982, the Office of Supervisory Agent, Supervisory Agent, FHLBB–Cincinnati, requested an expanded accountant's opinion to provide additional information required under existing regulatory guidelines. Pl.'s Mot. for Summ. J.App., Ex. A13 (Letter from Alma Roberts, Executive Assistant, Office of Supervisory Agent, FHLBB–Cincinnati to David E. Sharp, President, Home Federal, Feb. 5, 1982). On February 8, 1982, Home Federal's independent accountant sent a letter to Ms. Roberts submitting the requested additional information

justifying and describing the use of the purchase method of accounting for the merger with Second Federal. Pl.'s Mot. for Summ. J.App., Ex. A14 (Letter from Charles S. White, CPA, Pugh & Co. to Alma Roberts, Executive Assistant, Office of Supervisory Agent, FHLBB–Cincinnati, Feb. 8, 1982). According to the plaintiff, "[t]he FHLBB has never objected to the adequacy of the February 8, 1982 correspondence." Pl.'s Mem., Sept. 18, 1997, at 17 n. 4. Home Federal proceeded, from the date of the merger, December 31, 1981, until the implementation of FIRREA eight years later, to treat the negative net worth of Second Federal as an asset to be amortized over a forty-year period, with no objection from the FHLBB or the FSLIC.

On August 9, 1989, Congress enacted FIRREA, which limited Home Federal's ability to count Security Federal's goodwill as an asset and to amortize it over a lengthy time period.

### *Discussion*

#### A.  Standard for Decision

Summary judgment is appropriate if there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims ("RCFC") 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that would affect the outcome of the case. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. The movant bears the initial burden of establishing an absence of genuine issues of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmovant then has the burden of producing sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. 2505. It is not necessary that such evidence be admissible at trial, but mere denials, conclusory statements, or evidence that is mere-

---

7.  In addition, the parties identify additional letters and materials that were sent or forwarded to the Washington, D.C. office of the FHLBB but stipulate that these would not serve as bases

upon which the plaintiff could assert its *Winstar*-type claims. Joint Stipulation of Facts, Dec. 23, 2003, at 3–4; Def.'s Renewed Cross–Mot. for Summ. J. at 5–6.

ly colorable or not significantly probative is not sufficient to withstand summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390–91 (Fed. Cir.1987).

Although the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action,'" *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. 2548, trial courts should act with caution in granting summary judgment and may deny it if there is reason to believe that a full trial is warranted. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. Caution is imperative because, "[alt]hough speedy and inexpensive, summary judgment is nonetheless a 'lethal weapon' capable of 'overkill.'" *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1116 (Fed.Cir.1985) (citations omitted); *see also D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1146–47 (Fed.Cir.1983) ("an improvident grant [of summary judgment] may deny a party a chance to prove a worthy case and an improvident denial may force on a party and the court an unnecessary trial").

A court does not "weigh" each side's evidence when considering a motion for summary judgment, *Contessa Food Prods., Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1376 (Fed. Cir.2002), but rather "the inferences to be drawn from the underlying facts... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). "In particular, [in the *Winstar* context] any dispute regarding additional communications between plaintiff and the Government necessarily requires credibility determinations and the weighing of evidence and is especially inappropriate for resolution on summary judgment." *Fifth Third Bank of W. Ohio v. United States,* 52 Fed.Cl. 264, 269 (2002) ("*Fifth Third I*")

(citing *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505; *Jay v. Sec'y of DHHS,* 998 F.2d 979, 982 (Fed.Cir.1993)). On cross-motions for summary judgment, courts must evaluate each motion on its own merits and resolve any reasonable inferences against the party whose motion is being considered. *Mingus,* 812 F.2d at 1391. A court should deny both motions if genuine disputes exist over material facts. *Id.*

### B.  Contract Formation

█  In considering a motion for summary judgment, a court "must be guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. For a *Winstar*-related claim, courts apply "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties." *Winstar III,* 518 U.S. at 871, 116 S.Ct. 2432. "To form an agreement binding upon the government, four basic requirements must be met: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Anderson v. United States,* 344 F.3d 1343, 1353 (Fed.Cir.2003). These requirements apply equally to both express and implied-in-fact contracts. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir. 1997).

"Whether a contract exists is a mixed question of law and fact." *California Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1346 (Fed.Cir.2001) ("*CalFed II*") (citations omitted). As the Court has observed, "[c]ontracts are not technical documents requiring certain forms. Rather, they are legal relationships imposed by the law on parties when certain functional prerequisites like intent, offer, acceptance, and consideration occur in logical sequence." *California Fed. Bank, FSB v. United States,* 39 Fed.Cl. 753, 773 (1997) ("*CalFed I*"), *aff'd,* 245 F.3d 1342 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002). Thus, "'[r]egulatory' documents can be construed as contractual commitments where the reality of the transaction supports such a con-

struction. However, the burden of proving that the reality of a transaction favors construing such documents as contractual undertakings, as opposed to regulatory statements, remains with plaintiff." *Fifth Third I,* 52 Fed.Cl. at 274–75. "Whether a contract exists in this case * * * depends on all the facts and circumstances surrounding the acquisition[s] * * * and, most importantly, the role of the government in that transaction." *Advance Bank, FSB v. United States,* 52 Fed.Cl. 286, 288 (2002).

### 1. Authority to contract

■ The Government argues that the Principal Supervisory Agent did not possess authority to bind the Government in contract pursuant to his approval of the Home Federal and Second Federal merger. To prove that the Government is contractually bound, Home Federal must establish that the pertinent PSA had actual authority to bind the Government. *Commercial Fed. Corp. v. United States,* 55 Fed.Cl. 595, 616 (2003). This authority can be either express or implied in fact. *Id.* " " 'Government employees hold express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants them such authority in unambiguous terms.' " " *Id.* (quoting *First Fed. Lincoln Bank,* 54 Fed.Cl. at 452). "[A]ctual authority may be implied when such authority is 'an integral part of the duties assigned to a [g]overnment employee.' " *Commercial Fed. Corp.,* 55 Fed.Cl. at 616 (quoting *Roy v. United States,* 38 Fed.Cl. 184, 189 (1997)).

The question of authority in this case is whether or not the relevant regional officials, specifically the PSA, had authority, at the time the Home Federal and Second Federal merger application was submitted, considered, and approved-from November 20, 1981, to February 8, 1982-to bind the Bank Board and thus the Government. Importantly, this

Court previously held that PSA's and other regional supervisory officials *did not have the legal authority to contractually bind* the FHLBB to promises regarding goodwill prior to February 25,1982, when the FHLBB, under 47 Fed.Reg. 8152 (Feb. 25, 1982), expanded its delegation of authority to allow PSA's "to approve merger applications in which goodwill is included in assets" and to "agree to certain forbearances in approving supervisory mergers which are currently granted by the Board." *Home Fed. Bank of Tenn.,* 57 Fed.Cl. at 688; *see also id.* at 687–89.[8]

### 2. Analysis

■ On the merits of this issue, the Government argues that summary judgment should be granted with respect to the plaintiff's remaining claim because the Second Federal transaction was approved by regional supervisory officials that, at that time, lacked authority to bind the Government to a *Winstar*-type agreement. The Government notes that the following facts are established and undisputed: Home Federal submitted its application seeking approval of its proposed merger with Second Federal to the regional officials and not the FHLBB, the application "was approved exclusively by the regional officials at FHLB–Cincinnati," "[t]he FHLB–Cincinnati's regulatory approval was issued on December 24, 1981, and Home Federal completed the merger on December 31, 1981," and that "[a]lthough FHLBB's records indicate that documents related to Home Federal's merger with Second Federal were forwarded to the FHLBB's D.C. office after the FHLB–Cincinnati approved the transaction (and before the merger was completed), there is no evidence that the [sic] these materials were sent in order to obtain any approval from the Washington, D.C. office of the FHLBB." Def.'s Renewed Cross–

---

8. In other cases, the United States Court of Federal Claims has held that subsequent to the delegation made in February 1982, PSA's had authority to bind the FHLBB to promises regarding goodwill. E.g., *Fifth Third Bank of W. Ohio v. United States,* 52 Fed.Cl. 637, 643 (2002) (*"Fifth Third II "*) (explaining that after the 1982 delegation PSA's had implied actual authority to bind the FHLBB, based on the fact that "[t]he ability

of the regional banks to make promises regarding the use of supervisory goodwill * * * was integral to fulfilling their role in FHLBB's policy to encourage the private acquisition of failing thrifts"); *see also Commercial Fed. Corp.,* 55 Fed. Cl. at 618; *First Fed. Lincoln Bank,* 54 Fed.Cl. at 453; *Southern Nat'l Corp. v. United States,* 54 Fed.Cl. 554, 558 (2002).

Mot. for Summ. J. at 4–5. The Government concludes:

> With respect to the Second Federal merger, the parties agree that "Home Federal's application to acquire Second Federal was not forwarded to the Washington, D.C. office of the FHLBB prior to the December 24, 1981 regulatory approval of the transaction," JSF ¶ 4, and that "the merger ... was approved * * * by the FHLB–Cincinnati Principal Supervisory Agent, Mr. Charles Lee Thiemann," *id.* ¶ 3. Because the Court has ruled that regional official[s] such as Mr. Thiemann lacked authority to enter *Winstar*-type contracts at the relevant time, and the parties agree that Mr. Thiemann was the relevant regulatory official who approved the Second Federal transaction, we respectfully ask that summary judgment be granted in the Government's favor with respect to that transaction.

Def.'s Renewed Cross Mot. for Summ. J. at 5.

The plaintiff responds by agreeing that based upon the stipulated facts of the Second Federal transaction and this Court's previous legal conclusion that PSA's and other regional supervisory officials did not have the legal authority to contractually bind the FHLBB to promises regarding goodwill prior to February 25, 1982–the Government's summary judgment motion with respect to the plaintiff's claims arising from the Second Federal transaction should be granted. Specifically, the plaintiff states that it "recognizes that, based on the stipulated facts and the law of the case, this Court may enter summary judgment on the [G]overnment's behalf regarding the Second Federal merger on authority grounds." Pl.'s Resp., Jan. 23, 2004, at 2 (footnote omitted).

■ The Court finds that, as in the First Federal and Security Federal merger transactions, the relevant regional officials did not have implied actual authority to bind the FHLBB to promises relating to Home Federal's amortization and use of goodwill toward regulatory capital resulting from its acquisition of Second Federal. As a matter of law, the plaintiff has failed to make the case that the relevant supervisory agents possessed actual authority to enter into a contract with the plaintiff to treat the merger with Second Federal according to the purchase method of accounting. Moreover, even had the relevant regional officials possessed adequate authority, the facts of the transaction demonstrate that they were acting wholly as a regulator and not as a contracting party when they approved of Home Federal's use of the purchase method of accounting in the Second Federal transaction. Further, as with the other two transactions, the FHLBB did nothing to demonstrate its acceptance of the purported agreement with respect to the Second Federal transaction, other than to remain silent as to the plaintiff's accounting practices. "Silence in and of itself," however, is not sufficient to establish ratification. *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1434 (Fed.Cir.1998), *cert. denied*, 525 U.S. 1177, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999). Despite the Court's specific concern with potential acts of ratification with respect to the Second Federal transaction, *see* Oct. 21, 2003 Order at 3, both parties have submitted stipulated facts and the plaintiff has offered no evidence that the Bank Board either had actual or constructive knowledge that the supervisory agent had attempted to enter into a contract for the specialized accounting treatment of goodwill beyond any normal regulatory allowance or took any subsequent action to ratify such agreement.[9] *See* Pl.'s Resp. to Def.'s Renewed Cross–Mot. for Summ. J.

In summary, as the Court previously held, the regional regulatory officials of the FHLBB lacked legal authority to bind the Government to a *Winstar*-type agreement at the time the First Federal and Security Federal acquisitions occurred in August 1981. Further, those regional officials possessed the same, limited authority in December 1981, when the Second Federal acquisition was approved, as no such

---

9. Indeed, the plaintiff offers no factual or legal arguments in its response to the renewed motion for summary judgment to suggest or to argue that the purported contractual agreement between it and the Government with respect to the Second Federal transaction was in any way ratified by the Bank Board. *See, e.g.,* Pl.'s Resp. to Def.'s Renewed Cross–Mot. for Summ. J.

delegation of authority occurred until February 25, 1982. The factual record, including the parties' Joint Stipulation of Facts and other factual concessions and party admissions in the relevant submissions, establishes that all relevant activities with respect to the consideration and approval of Home Federal's merger with Second Federal occurred at the FHLBB regional supervisory level. Further, the plaintiff has not argued and has failed to establish that the FHLBB undertook any action during the application and approval process or subsequent thereto to ratify the regulatory approval given to the Second Federal transaction. Thus, as with the First Federal and Security Federal transactions, this Court finds that summary judgment for the defendant is appropriate.

## CONCLUSION

For the foregoing reasons, the Defendant's motion is GRANTED. Thus, it is ORDERED that:

(1) The Defendant's Renewed Cross–Motion for Summary Judgment is GRANTED;

(2) Under this Court's Opinion of August 26, 2003, and this Opinion, the Court finds that the plaintiff cannot sustain causes of action for either breach of contract or for breach of contract implied in fact with respect to the plaintiff's acquisitions of First Federal, Security Federal, and Second Federal; therefore, Count I (Breach of Contract) and Count II (Breach of Contract Implied in Law (Fact)) of the Complaint are to be dismissed; and final judgment shall be entered dismissing the Complaint in its entirety.

(3) Each party is to bear its own costs.